**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

FILED
2016 OCT 11 PM 3: 57
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

| | |
|---|---|
| LINCOLN RYMER,<br>    Plaintiff,<br><br>    v.<br><br>ROBERT LEMASTER, individually or in his official capacity,<br>DOUG STERRETT, individually or in his official capacity,<br>LAURA STERRETT, individually or in her official capacity,<br>UNIVERSITY OF TENNESSEE,<br>ROGER OLDHAM,<br>JOHN DOE 1, individually or in his or her official capacity,<br>JOHN DOE 2, individually or in his or her official capacity,<br>JOHN DOE 3,<br><br>            Defendant(s). | CASE NO.<br><br>Judge:<br><br><br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Lincoln Rymer for his Complaint against the Defendants listed below, hereby demands a jury

trial and alleges as follows:

## I. INTRODUCTION

1. Lincoln Rymer, as an unemancipated minor, at the age of sixteen (16) matriculated into the

University of Tennessee at its campus in Martin, Tennessee. Early on, he showed great aptitude in

advocating for student rights. As a seventeen (17) year old, Mr. Rymer challenged intolerable acts of a

UT Martin math professor. As a result, he saved himself and approximately twenty (20) other students,

some of whom were twice his age, from Calculus II course failure. Beginning at age nineteen (19), Mr.

Rymer advocated for curriculum reform seeking inclusion of "hands-on" practice to augment the UT

Martin School of Engineering's theoretical coursework. It has long been a hallmark of German

engineering to combine theory with practice. Hundreds of German and Swiss engineering firms cite

"theoretisches Fachwissen in Verbindung mit praktischem Anwender-Know-how" (translated

"theoretical specialty knowledge in combination with practical user know-how") as their guiding

Page 1

principle.  Johann Wolfgang von Goethe said "It is not enough to have knowledge, one must apply it."

Theory without practice is folly, and practice without theory, at best, is costly trial and error.  Mr.

Rymer's opinions on these concepts, intrinsic to the Teutonic engineering mindset, were not shared by

Mr. Rymer's professors at UT Martin including Dr. Doug Sterrett's wife, Prof. Laura Sterrett, and Dr.

Robert Lemaster.

> "Indeed, the progress of our professions…may depend upon the "discord and dissent"
> of students training to enter them: it is by challenging the inherited wisdom of their
> respective fields that the next generation of professionals may develop solutions to the
> problems that vexed their predecessors...As the Supreme Court has explained, "The
> essentiality of freedom in the community of American universities is almost self-evident
> …To impose any strait jacket upon the intellectual leaders in our colleges and universities
> would imperil the future of our Nation…Teachers and students must always remain free to
> inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our
> civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957);
> *see also Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010).
> ...[S]tudents do not "shed their constitutional rights to freedom of speech or expression at
> the schoolhouse gate." *Tinker v. Des Moines Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)."
> <u>*Oyama v. University Of Hawaii,*</u> No. 13-16524 (9th Cir. 2015)

2. During the aforementioned time, in addition to being a UT Martin student, Mr. Rymer was

also employed by UT Martin under the supervision of Mr. Lee Bennett with whom he had an

impeccable working relationship and excellent work reviews.  Soon after expressing his interests in

"hands-on" engineering he was reassigned to engineering Prof. Laura Sterrett.  They had what appeared

to be a successful and effective working relationship.

3. Subsequently Dr. Robert Lemaster assigned Mr. Rymer to a mandatory student project,

approved by Prof. Laura Sterrett's husband, the Dean of the School of Engineering, Dr. Doug Sterrett,

to design and build a high-speed 3-axis CNC Milling Machine with an automatic toolchanger packaged

in a tabletop form factor.  On November 19, 2015 Mr. Rymer discovered incontrovertible facts that

demonstrate the student project to be an impossible assignment.  Stemming from their credentials and

work history, both professors possessed actual or constructive knowledge that the project was an

impossible task.  Given the newly discovered facts, which were not available at the time of the student

project, it is obvious, in hindsight, that the student project was a "wild goose chase". The assignment consumed approximately 1000 hours of Mr. Rymer's time over the course of two semesters and negatively impacted his grades on other coursework during that timeframe. Additionally, Mr. Rymer received a bad grade on the project. Mr. Rymer's bad grades were a "badge of infamy" that prevented him from obtaining gainful employment. Not until November 19, 2015 did Mr. Rymer discover the grades to be unmerited.

> "[W]here the State attaches "a badge of infamy" to the citizen, due process comes into play." *Wieman v. Updegraff*, 344 U. S. 183, 191..."Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."
> *Wisconsin v. Constantineau*, 400 U.S. 433 (1971)

4. In December 2015, while attempting to rationalize why Dr. Sterrett would approve Mr. Rymer's assignment to an impossible project, Mr. Rymer's memories restored pertaining to two (2) incidents involving Dr. Sterrett's wife, Prof. Laura Sterrett, that at the time the incidents occurred, seemed insignificant. The first recalled incident was Prof. Sterrett had proselytized Mr. Rymer. The second recalled incident pertained to a tool inventory of "bastard files", bastard being a proper technical term as shown in the attached Exhibit D. Prof. Sterrett took exception to the use of that terminology and appeared to be offended. A few months later Mr. Rymer was intercepted by a stranger on campus who was an extremely visually-appealing sorority coed named Amanda Lamberth who insisted Mr. Rymer attend with her an event at a fraternity house. Over a period of approximately twenty-two (22) months Lamberth managed to convert Mr. Rymer to Prof. Sterrett's religion. Not until March 4, 2016 did Mr. Rymer have direct evidence that he was a victim of "Flirty Fishing", i.e. a covert scam that uses beautiful women as bait to surreptitiously lure men into religious indoctrination. Not until the last week of August 2016 did Mr. Rymer have evidence that Prof. Laura Sterrett had a role in said sub rosa conspiracy.

"At the heart of liberty is the right to define one's own concept of existence, of meaning,

Page 3

of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Planned Parenthood of Southeastern Pa.v. Casey*, 505 U.S. 833 (1992)

5. Both the State-induced religious indoctrination and the impossible student project stem from the same core nucleus of retaliatory intent and form the basis of the causes of action plead herein.

6. Mr. Rymer's family placed full faith and trust in the institution of higher education, including the University of Tennessee. Mr. Rymer's Uncle Bill was a chemical engineering graduate of UT Knoxville and a lecturer of patent law at Harvard Law School, his cousin, the Honorable Pamela Ann Rymer, was on the Board of Trustees at Stanford University, and his first cousin Dr. Landrum Bolling was also a graduate of UT Knoxville and served as president of Earlham College. The Rymer family considered the institution of higher education, including the University of Tennessee, to be beyond reproach. It was implicitly assumed that Lincoln Rymer would be treated with an implied duty of good faith and fair dealing and that he would be in good hands. Because of this, the Rymer family provided zero oversight in the affairs of Lincoln's schooling. Mr. Rymer had no means of avoiding becoming a victim nor the means of discovering his injuries, the causes of his injuries, or the identities of the tortfeasors until the times stated within this Complaint.

7. University of Tennessee engineering professors have a history of regulating the difficulty of non-standardized student assignments to suit professors' private interests. In 1995 two University of Tennessee engineering professors, Dr. Walter Frost and Dr. Robert Turner, were both convicted and sentenced to federal prison on mail fraud charges for, inter alia, defrauding their fiduciaries of their intangible Right to Honest Services. Dr. Lemaster had a fiduciary duty to Mr. Rymer stemming from his status as Mr. Rymer's Academic Adviser and his Senior Project Adviser. Frost and Turner had "turned the knob" to minimal academic rigor in exchange for financial kickbacks from students, but Dr. Lemaster and Dr. Sterrett "turned the knob" to infinite academic rigor on Mr. Rymer. Dr. Lemaster knowingly psychologically tortured and defrauded Mr. Rymer in exchange for the financial benefit of

continued employment under his supervisor, Dr. Sterrett.

8. Mr. Rymer, as a teenager and young adult, was cunningly defrauded and mauled by a pack of Ph.D.'s twenty-plus years his senior. In Lynch Law in America the noted civil rights leader Ida Wells-Barnett defined a lynching as the "cool, calculating deliberation of intelligent people who openly avow that there is an "unwritten law" that justifies them in putting human beings to death without complaint under oath, without trial by jury, without opportunity to make defense, and without right of appeal." The acts committed against Mr. Rymer by the defendants were modern day equivalents to a lynching but were done in secret, orchestrated from behind closed doors, often times in violation of the Tennessee Open Meetings Act, and executed without due process. The damages wrought unto Mr. Rymer included, inter alia, the destruction of his substantive due process property rights in his personal reputation and infringement of his right to equal protection under the 14th Amendment, humans rights violations under the United Nations Charter, the total loss of his financial investment in higher education, compulsion into a religion through the guile and deception of an agent of the State, ostracism by family and friends, and societal relegation to a dismal life as a low wage laborer with no health insurance, no vacation pay, no sick days, no coffee breaks, no retirement benefits and no hopes of ever bettering his life.

> "...the thing about students that's different and worth talking about is that they're are marginal populations, like the elderly, where bad things tend to happen first."
> Dr. Bruce Schneier, *Schools keep track of students' online behavior, but do parents even know?*, http://www.csoonline.com/

## II. THE PARTIES

9. Lincoln Rymer is a citizen of Tennessee.

10. Defendant, Robert Lemaster, hereafter referred to as Dr. Robert Lemaster or Dr. Lemaster, in his individual or official capacity as an employee of the University of Tennessee, resides in Tennessee.

11. Defendant, Doug Sterrett, hereafter referred to as Dr. Doug Sterrett or Dr. Sterrett, in his individual or official capacity as an employee of the University of Tennessee, resides in Tennessee.

12. Defendant, Laura Sterrett, in her individual or official capacity as an employee of the University of Tennessee, resides in Tennessee.

13. Defendant, the University of Tennessee, hereafter referred to as UT or UT Martin, is a state institution located in Tennessee and was created by an Act of the Tennessee General Assembly, 1807 Tenn. Pub. Acts Ch. 64, whose chartered objective is "to engage in the governmental function of affording an education primarily to the youth and citizens of the State of Tennessee". UT affects interstate and foreign commerce by selling educational services to persons from the United States and The World. In marketing its services it "reaches in" to the Middle District of Tennessee with its admissions recruiters and postal mailings.

14. Defendant, Roger Oldham, hereafter referred to as Dr. Roger Oldham or Dr. Oldham, is a citizen of Tennessee who lives in the Middle District of Tennessee and, at the time of the incidents giving rise to this Complaint, worked in Martin, Tennessee within the spiritual services industry.

15. Defendant, John Doe 1, in his or her individual or official capacities, is or was an employee of UT Martin.

16. Defendant, John Doe 2, in his or her individual or official capacities, is or was an employee of UT Martin.

17. Defendant, John Doe 3 is the entity that has lawful title to the FFELP Promissory Note(s) signed by Mr. Rymer to pay for the educational services rendered by UT Martin.

18. Joinder of all defendants is proper pursuant to Fed. R. Civ. P. 20(a)(2) because the relief sought against each of them arises from the same core nucleus of transactions, facts, or laws.

19. – 29. [Reserved.]

## III. JURISDICTION AND VENUE

30. This action arises under the Federal Computer Fraud and Abuse Act codified at 18 U.S.C. §1030 *et seq.*; Civil Rights Act of 1871 (commonly known as the Ku Klux Klan Act) codified at 42 U.S.C. §1981 *et seq.*; Racketeer Influenced and Corrupt Organizations Act (RICO) codified at 18 U.S.C. §1961 *et seq.*; Higher Education Amendments of 1998 codified at 20 U.S.C. §1011a; Title IX of The Education Amendments of 1972 codified at 20 U.S.C. §1681 et seq.; Federal Trade Commission Trade Regulation Rule 433 promulgated at 16 C.F.R. §433 *et seq.*; and multiple state claims which require application of federal law, viz. Family Educational Rights and Privacy Act (FERPA) and Protection of Pupil Rights Amendment (PPRA).

31. This action also arises under Tennessee law, including claims for common law fraud, intentional infliction of emotional distress, assault, civil conspiracy, invasion of privacy, malicious harassment, breach of fiduciary duty, breach of contract, promissory estoppel, fraudulent or intentional misrepresentation, tortious interference with contractual relations, fraudulent inducement to contract, defamation, violation of the Tennessee Human Rights Act, and negligent hiring, training, or supervision of employees.

32. This Court has subject matter jurisdiction over the federal claims listed at ¶30, *supra*, pursuant to 28 U.S.C. §1331 (federal question) or 28 U.S.C. 1343 (civil rights).

33. This Court also has subject matter jurisdiction over the state claims listed at ¶31, *supra*, pursuant to 28 U.S.C. §1367 (supplemental jurisdiction).

34. – 44. [Reserved.]

## IV. VENUE

45. Venue in this Court is proper pursuant to 28 U.S.C. §1391(b)(1) because defendant Dr. Oldham resides in this judicial district or pursuant to 28 U.S.C. §§1391(b)(1) and 1391(c)(2) because UT is an arm of the State of Tennessee, UT resides in the Nashville Division of the Middle District of

Tennessee, subjecting UT to this Court's personal jurisdiction.

46. – 49. [Reserved.]

## V. IMPLIED PRIVATE RIGHT OF ACTION UNDER 20 U.S.C. §1011a

50. Plaintiff outlines arguments that an implied private right of action exists under Title I of the Higher Education Amendments of 1998, Public Law 105–244, 112 STAT. 1591 codified at 20 U.S.C. §1011a. The same grounds that established a private right of action under Title IX of the Education Amendments of 1972 and abrogated sovereign immunity against monetary damages by Title X Rehabilitation Act Amendments of 1986 shall establish the same under Title I. The reasoned analysis clearly Illuminates that Title IX, Title X, and Title I open the door to remedies sought under §1011a. Additionally, such a new statutory cause of action would not preclude a §1983 action alleging unconstitutional speech discrimination in schools for the same reasons that *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246 (2009) held Title IX not precluding a §1983 action alleging unconstitutional gender discrimination in schools.

51. Implied Enforcement Mechanism

The caption of Higher Education Amendments of 1998, Public Law 105–244, 112 STAT. 1591 codified at 20 U.S.C. §1011a establishes the purpose of the statute as the "Protection of student speech and association rights". Relevant to the case at bar this statute states:

> "(1) It is the sense of Congress that no student attending an institution of higher education on a full- or part-time basis should, on the basis of participation in protected speech...be subjected to discrimination or official sanction under any education program, activity, or division of the institution directly or indirectly receiving financial assistance under this chapter and part C of subchapter I of chapter 34 of title 42, whether or not such program, activity, or division is sponsored or officially sanctioned by the institution. (2) It is the sense of Congress that—(A) the diversity of institutions and educational missions is one of the key strengths of American higher education;...(C) an institution of higher education should facilitate the free and open exchange of ideas; (D) students should not be intimidated, harassed, discouraged from speaking out, or discriminated against; (E) students should be treated equally and fairly; and (F) nothing in this paragraph shall be construed to modify, change, or infringe upon any constitutionally protected religious liberty, freedom, expression, or association"

"(3) Protected speech
The term "protected speech" means speech that is protected under the first and 14th amendments to the Constitution, or would be protected if the institution of higher education involved were subject to those amendments."

52. This statute is contained in an Act of Congress. This is not a joint resolution merely for the sake of offering lip service to the tens of millions of students in American schools that receive federal student aide funding. Any argument that this statute has no enforcement mechanism is to state that Congress has enacted a law with no teeth.

> "We will not attribute such incompetence to Congress. Statutes and regulations must be construed to avoid absurd and whimsical results, unrelated to congressional purpose. _Church of the Holy Trinity v. United States_, 143 U.S. 457, 460, 12 S. Ct. 511, 512, 36 L. Ed. 226 (1892); _United States v. American Trucking Associations_, 310 U.S. 534, 543, 60 S. Ct. 1059, 1064, 84 L. Ed. 1345 (1940). "The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation requires." _United States v. Menasche_, 348 U.S. 528, 538-39, 75 S. Ct. 513, 519-20, 99 L. Ed. 615 (1955) (citations omitted); see also Sode v. United States, 209 Ct. Cl. 180, 531 F.2d 531, 538 (1976). (cited in _Ellen M. Kelly v. The United States, Rosemary J. McCarthy v. The United States_, 826 F.2d 1049 (Fed. Cir. 1987)

53. Implied Private Right of Action

(A) The Department of Education did not create the regulatory framework necessary for the Government to enforce 20 U.S.C. §1011a. Absent a private right of action, this Act of Congress would be a law with no teeth and would thwart Congress's intention in the "Protection of student speech and association rights".

(B) Furthermore the operative language in 20 U.S.C. §1011a (hereafter Title I) is nearly verbatim that of Title IX which was deemed to have an implied private right of action in _Cannon v. University of Chicago_, 441 U.S. 677 (1979):

Title I (with clauses in common with Title IX underlined):

"...no student attending an institution of higher education on a full- or part-time basis should, on the basis of participation in protected speech or protected association, be

Page 9

excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanction under any education program, activity, or division of the institution directly or indirectly receiving financial assistance"

Title IX (with clauses in common with Title I underlined):

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."

(C) The four-part test set forth in *Cort v. Ash*, 422 U.S. 66 (1975), determines whether Congress had meant for a law to be privately enforced:

i.) Is Mr. Rymer a member of a special class for whose benefit the statute was enacted?

Unquestionably, the first of the four factors identified in Cort favors the implication of a private right of action. Title I explicitly confers a benefit on students discriminated against on the basis of speech, and Mr. Rymer is clearly a member of that class for whose special benefit the statute was enacted.

ii.) Does legislative history express a legislative intent to create or deny a private right of action?

Given Title IX's and Title I's nearly verbatim language (materially differing only in the proscribed discriminatory animus), one can surmise that Congress modeled Title I on Title IX, and since at the time of Title I's creation, *Cannon* had created a private right of action on Title IX, and Congress did not "overturn" *Cannon* by legislating a solely governmental enforcement mechanism of Title IX, one can surmise the intent of Congress to also confer a private right of action under Title I.

> "We must recognize, however, that the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question. Therefore, in situations such as the present one "in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to create a private cause of action, although an explicit purpose to deny such cause of action would be controlling." *Cort*, 422 U. S., at 82 (emphasis in original)

iii.) Would creation of a private right of action frustrate legislative scheme, or is it in fact helpful to it?

> "The first purpose is generally served by the statutory procedure for the termination of federal financial support for institutions engaged in discriminatory practices. That remedy

is, however, severe and often may not provide an appropriate means of accomplishing the second purpose if merely an isolated violation has occurred. In that situation, the violation might be remedied more efficiently by an order requiring an institution to accept an applicant who had been improperly excluded. Moreover, in that kind of situation it makes little sense to impose on an individual, whose only interest is in obtaining a benefit for herself, or on HEW, the burden of demonstrating that an institution's practices are so pervasively discriminatory that a complete cutoff of federal funding is appropriate. The award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with and in some cases even necessary to the orderly enforcement of the statute." _Cannon v. University of Chicago_, 441 U.S. 677 (1979)

For the same reasons held by the Court in _Cannon,_ a private right of action in Title I would be

helpful to the legislative scheme.

iv.) Does the right involve an area that historically has basically been of concern to the States?

"No such problem is raised by a prohibition against invidious discrimination of any sort, including that on the basis of sex. Since the Civil War, the Federal Government and the federal courts have been the " `primary and powerful reliances' " in protecting citizens against such discrimination. Steffel v. Thompson, 415 U.S. 452, 464 (emphasis in original), quoting F. Frankfurter & J. Landis, The Business of the Supreme Court (1928). Moreover, it is the expenditure of federal funds that provides the justification for this particular statutory prohibition. There can be no question but that this aspect of the Cort analysis supports the implication of a private federal remedy...In sum, there is no need in this case to weigh the four Cort factors; all of them support the same result. Not only the words and history of Title IX, but also its subject matter and underlying purposes, counsel implication of a cause of action in favor of private victims of discrimination." _Cannon v. University of Chicago_, 441 U.S. 677 (1979)

For the same reasons held by the Court in _Cannon,_ a private right of action in Title I would not

raise such a problem by a prohibition against invidious discrimination of any sort, including that on the

basis of student speech.

54. – 65. [Reserved.]

## VI. FACTS
### Facts Pertaining to UTMill
66. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

67. As a student in the Waverly Junior High School and the Waverly Central High School, Mr.

Rymer was taught that as an American citizen or a citizen of the State of Tennessee he had numerous

inalienable rights, including the right to freedom of speech and expression without fear of government

Page 11

retaliation as guaranteed by both the U.S. Constitution and the Tennessee State Constitution. Mr. Rymer and his father relied upon such guarantees in choosing to purchase educational services from UT Martin. Additionally, UT Martin advertised in its marketing literature that the Professors care about the students. Mr. Rymer and his father also relied upon that statement in choosing to contract with UT Martin for educational services.

68. Mr. Rymer's education from 1996-2000 was financed through FFELP loans.

69. The UT Martin Loan Request Forms signed by Mr. Rymer did not provide notice that a borrower could choose a lender not on the Preferred Lender List.

70. From the Spring semester of 1998 to Spring semester of 2000, Mr. Rymer frequently voiced his opinions on the virtues of "hands-on" practice to augment engineering theory. Dr. Sterrett appeared to be receptive and was at all times outwardly congenial towards Mr. Rymer. During the Fall of 1999 Mr. Rymer visited Dr. Robert Lemaster during office hours to express his concerns that the theoretical nature of the engineering program was not going to adequately prepare him for a career in industry. Dr. Lemaster brushed off the notion and declared that employers would provide on-the-job training and that employers wouldn't "throw [Mr. Rymer] to the wolves" by assigning Mr. Rymer to a task beyond Mr. Rymer's capabilities.

71. From January 2000 to December 2000 Dr. Robert Lemaster was Mr. Rymer's Academic Adviser and his Senior Project Adviser and had a fiduciary duty to Mr. Rymer.

72. During the Spring and Fall semesters of 2000, Dr. Lemaster assigned Mr. Rymer, as a graduation requirement, to a project encompassing the design and fabrication of a high-speed 3-axis CNC Milling Machine with an automatic toolchanger packaged in a tabletop form factor with 16" x 8" x 8" XYZ travels. The machine was christened UTMill. (Exhibit A)

73. Mr. Rymer was pleased to be assigned to the aforesaid project because it was within a field of interest to Mr. Rymer, and because Mr. Rymer expected it to provide much needed "hands-on"

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 12 of 59 PageID #: 12

experience, and because Mr. Rymer assumed it was a feasible project by his reliance upon his fiduciary, Dr. Lemaster, to assign a feasible project.

74. The project's goal-post was raised five (5) separate times, with the first such "iteration", as Dr. Lemaster called the goal-post changes, requiring the machine to be designed and built from scratch.

75. Mr. Rymer did not know the student project was impossible and did not have access to facts that would have shown the aforementioned student project was impossible until he discovered on November 19, 2015 the Haas OM 2A, a miniature CNC milling machine virtually identical in specs to UTMill, and whose sales price of ~$80,000 is greater than the sales price of many full-size, industrial-grade CNC milling machines that weigh more than two (2) elephants and are the size of a moving van and obviously could not be designed or built by college students.

76. The specifications of the assigned student project as compared to the Haas OM 2A differed only in relatively small details that would not appreciably affect the technical skill or financial outlay needed to successfully complete the project.

77. Ott Jakob Spanntechnik GmbH is a German company that produces power drawbars, one of the many components necessitated by the aforementioned student project. Ott Jakob most succinctly describes on its website homepage what it takes to successfully design or manufacture these type products: „Mit unserer **jahrzehntelangen Erfahrung** und unserem **umfassenden Anwender-Know-how** bieten wir exzellente technische Lösungen, die sicher funktionieren...über Jahre garantieren" http://www.ott-jakob.de/ (emphasis added). Translated, "With our decades of experience and our extensive practical know-how, we offer excellent technical solutions that are guaranteed to function for years." College students, including Mr. Rymer, who was only twenty (20) years old at the time of the project, no matter how brilliant or gifted, simply can't have that set of traits and abilities because it is impossible for students to have decades of highly specialized **corporate** know-how representing the aggregate abilities of hundreds or thousands of experienced professionals amassed during a

Page 13

corporation's history.

78. The aforementioned student project would have required an army of experienced engineers and craftsmen skilled in CNC machine tool design and manufacturing, the hyper-specialized field of cutting force dynamometers, the specialized field of high-speed milling spindles, the hyper-specialized field of power drawbars, the hyper-specialized field of toolchangers, specialized field of machine tool "box-way slides".

79. Dr. Sterrett and Dr. Lemaster were both Ph.D. engineers with decades of experience working in aerospace or defense sectors which would have given them actual or constructive knowledge of facts regarding what is and what isn't a reasonable student project.

80. Despite Dr. Lemaster's fiduciary status to Mr. Rymer, Dr. Lemaster remained silent and failed to disclose material facts about the level of engineering skill, manpower, and financial resources necessary to pull off a project of the magnitude of the aforementioned student project. Dr. Lemaster falsely represented to Mr. Rymer that the student project was feasible. Dr. Lemaster also represented to Mr. Rymer that Dr. Lemaster could single-handedly design and build the high speed spindle for the machine.

81. Dr. Lemaster had spoken of his role in applying for a financial grant or forming a Center of Excellence (CoE) which caused Mr. Rymer to believe the necessary funds would be available. The grant or CoE, if nonexistent, were tricks or contrivances that excluded Mr. Rymer's suspicion and prevented inquiry.

82. Dr. Sterrett and Dr. Lemaster took affirmative action to conceal the abusive nature of the project by assigning inexperienced students to work with Mr. Rymer on the project. Had they assigned to the project top-ranked students who had gained real-world industry experience by participation in the Co-operative Education (Co-op) program, such students might have been able to recognize the project as an impossible assignment and taken action accordingly. Dr. Sterrett and Dr. Lemaster also took

Page 14

affirmative action to conceal the abusive nature of the project by choosing a table-top sized project with no prior art of invention which hid the complexity of the project.

83. Dr. Lemaster obtained or caused to be obtained through the mails or the wires, in furtherance of the scheme to injure Mr. Rymer, the following materials. In February or March 2000, Dr. Lemaster provided Mr. Rymer with papers featuring images of Thomson products incorporated in a machine tool & instructed that this type of product be researched for use in the student project. Dr. Lemaster credited www.thomsonbay.com as the source of the graphics contained in the papers. Around February 8, 2000 Dr. Lemaster instructed that internet research be performed on stepper motors and servo motors for use in student project. Around April 21, 2000 Dr. Lemaster instructed that internet research be performed on other miniature milling machines for use in the student project. Dr. Lemaster instructed on numerous occasions between February and September of 2000 that internet research be performed on various component technologies for use in the student project. In response to these instructions Mr. Rymer, between February and September of 2000, communicated with numerous companies in interstate commerce including: Thomson Industries, Arrick Robotics, Denford, Gilman Precision, Diebold AG, Diebold Goldring USA, GE Industrial Systems, Setco Inc., Hitachi, Ltd., Baldor Electric Co., Leeson, Thor Technologies, Rexroth Indramat, Precise Corp., Modern Machine Shop, University of California at Berkeley, Kistler Instrumente AG, and Kistler Instrument Corporation (see Exhibit C). In addition, Dr. Lemaster provided information to Mr. Rymer that was possessed in or affecting interstate commerce including literature obtained from the following: Thomson Bay Co. LLC, Vishay Measurements Group, Insul-8 Corporation (see Exhibit C).

84. The student project was a sick, sadistic Machiavellian tour de force of humans rights violating covert psychological torture which incorporated psychological warfare tactics such as "Setup for Failure", "Moving the Goalposts", the "Fork Bomb", and "Shock and Awe". The student project was successfully engineered with cold, calculated precision to silence Mr. Rymer's dissent on the

engineering curriculum or as retaliation for offending Laura Sterrett, or to force Mr. Rymer out of the engineering school, or to destroy Mr. Rymer's reputation, i.e., his G.P.A. Mr. Rymer's unmerited bad grades were a "badge of infamy" that prevented him from obtaining gainful employment.

85. At all relevant times, the Sterretts and Dr. Lemaster were Tennessee government employees employed by UT Martin.

86. The impact of this project affected Mr. Rymer's self-esteem and confidence in his intellectual capabilities. He made a religious conversion, dropped out of college, moved 1200 miles away to work in the NYC area for a $12/hr laboring job.

87. Approximately twenty (20) months after dropping out of college, Mr. Rymer returned to UT Martin. Mr. Rymer soon encountered Prof. Laura Sterrett in the hallway near EPS Building, Room 108. She, in an unfriendly tone and facial expression, muttered "Are you still here?"

88. Mr. Rymer completed the engineering degree in December 2002. His poor G.P.A. quelled any job offers, and Mr. Rymer was forced by circumstances to get a job working in produce at Wal-Mart which ended his engineering career before it even began.

89. Lincoln Rymer's cash-on-hand totaled less than $1750 during the aforementioned student project. Lincoln Rymer's cash-on-hand after the year 2013 dwindled from a high of $1550.

90. The UT Martin School of Engineering knew that its educational services were inadequately preparing "non Co-op" engineering students for 21st century real-world engineering careers.

91. UT Martin has since made good faith efforts to reform their engineering curriculum to include "hands-on" engineering training.

### Facts Pertaining to "Flirty Fishing" Fraud

92. "Flirty Fishing" is a confidence scheme used to achieve behavior modification via the covert indoctrination into religion. This fraud employs a Machiavellian oblique tactic designed to exploit the most fundamental physiological and psychological weaknesses of man: the desire for companionship,

Page 16

the desire for a help mate, the subconscious desire to perpetuate the species, and the desire for social acceptance. This stratagem is accomplished by dispatching an agent, typically a visually-appealing member of the opposite sex, to intercept the mark. Once the target has "fallen in love" with the bait, the agent introduces the mark to what are termed "gaffers" who perform the "heavy-lifting" of working with the victim to achieve behavior modification. "Flirty Fishing" is outrageous conduct which does not occur in civilized society absent negligence on the part of the "bait girl", and or any principals so orchestrating, in extending offers to the victim under pretense.

93. "Flirty Fishing" is a scam that was devised by the ancient Ammonite sorcerer Balaam, son of Beor. According to Moses (Num 31:16), Balaam recruited Moabite women to lure Israelite men to worship Baal. As a result, 25,000 Israelites and large numbers of Moabites died. Centuries later King Solomon, who is revered to be the wisest of all kings, succumbed to "Flirty Fishing" when he was lured into worshiping Baal by Naamah, daughter of the King of Ammon. They had a child, Rehoboam, who became the Ammonite King of Israel resulting in the splitting of Israel and bloody civil war (2 Chronicles 12:15). In modern times "Flirty Fishing" is still reported to cause bloodshed and strife. It was practiced by the Children of God (COG), currently known as Family International. Rose McGowan, a Hollywood actress, who was a member of COG, has stated 'The women would go to bars as lures (to pick up recruits) - they called it flirty fishing.' It has been reported that the Chinese Eastern Lightning cult practices this scam. In the Middle East it is known as "love jihad".

94. In December 2015, March 4, 2016, and the last week of August 2016 Mr. Rymer discovered the following facts. When Mr. Rymer was nineteen (19) years old he was unknowingly defrauded and was unknowingly harmed when his legal rights were, unbeknownst to him, infringed by a covert scam fraudulently concealed by multiple layers of obfuscation, that can be visualized by a model of a three-layer Matryoshka doll. The outer layer of the scam was a trojan horse in the form of a visually-appealing sorority coed named Amanda Lamberth. The middle layer was a confidence scheme

Page 17

executed by Lamberth called "Flirty Fishing" (Exhibit E) which was caused or furthered by a hidden inner layer engineered by Laura Sterrett who set into motion the clandestine provision to Dr. Oldham of Mr. Rymer's FERPA-PPRA protected student information including Mr. Rymer's internet searches performed on UT computer systems ("internet search history"), sexual preferences, entertainment preferences, student activism, private communications with his professors, or, in Laura Sterrett's misguided view, Mr. Rymer's use of foul language. This hidden scam tricked Mr. Rymer unawares into making a religious conversion which, controlled him from February or March 1999 until January 2016.

95. In December 2015, after Mr. Rymer discovered the Haas OM 2A, and after recalling Dr. Sterrett's role in the aforementioned student project and after recalling how Laura Sterrett had proselytized Mr. Rymer and after recalling how Mr. Rymer had offended her by using a tool's proper name, Mr. Rymer, for the first time, listened to a recording of a telephone call between himself and Dr. Oldham and discovered that Dr. Oldham had inquired about Mr. Rymer's engineering career using the same adjective, "hands-on", that Mr. Rymer had used in his private communications with his engineering professors while seeking curriculum reform. Dr. Oldham's inquiry is as follows: "Are you, ah, are you still working in the area of engineering? I know you wanted to do...the, the **hands-on** kind of things." Mr. Rymer also, in December 2015, first discovered the significance of four long-forgotten facts, that, at the time of occurrence, seemed unrelated and insignificant:

a.)that Mr. Rymer had offended Laura Sterrett in October or November of 1998,

b.)that he used UT computer systems in October or November of 1998 to view photos of a TV character on the TV show Buffy the Vampire Slayer that was a large busted brunette,

c.)that a stranger named Amanda Lamberth, a large busted brunette, intercepted him seeking companionship in March or April 1999,

d.)that in the Fall of 1999 Dr. Oldham, during a small group bible study, turned to Mr. Rymer, looked him in the eyes, and stated that there are people who watch Buffy the Vampire Slayer but won't

believe in the biblically supernatural.

96. Mr. Rymer, as a lonely, awkward teenager with raging hormones, was particularly susceptible and totally defenseless to "Flirty Fishing" and his response was an involuntary biological response to external stimuli presented to him by Lamberth.

97. Mr. Rymer did not initiate the first contact with Lamberth and was merely walking to the school's cafeteria in order to consume his dinner whereupon she committed "Flirty Fishing" fraud which totally impaired Mr. Rymer's ability to act according to the objective standard of the reasonable person model as he was afflicted with "love at first sight", a form of insanity, according to research by Rutgers anthropologist Helen Fisher. Lamberth was Mr. Rymer's Achilles' heel whose first interaction short-circuited his customary promethean foresight founded in logic and reason, instantly and totally impairing his ability to act according to the objective standard of the reasonable person model.

98. Lamberth concealed material information from Mr. Rymer in that upon first contact with Mr. Rymer she failed to state her de facto status as a student minister, or her true agenda: to get him into religion. Furthermore she made use of the device of "Flirty Fishing" that misled Mr. Rymer and excluded suspicion and prevented inquiry. The very nature of "Flirty Fishing" lends itself to stealth, thereby evading detection making the fraud inherently undiscoverable. Lamberth took affirmative action to conceal the cause of action by making first contact with Mr. Rymer under the pretense that she sought his companionship in attending with her an event at the ATO fraternity house in Martin, Tenn. At Lamberth's suggestion Mr. Rymer also attended with her other events including a sexually explicit comedy show.

99. Dr. Oldham, at the time of receipt of Mr. Rymer's statutorily-protected student information was **not** a member of UT Martin's faculty or staff, but rather was a private citizen who worked in Martin, Tennessee within the spiritual services industry.

100. Dr. Oldham, in his ministerial role as spiritual adviser to Mr. Rymer, had a fiduciary duty

Page 19

to Mr. Rymer. Dr. Oldham, being an expert in biblical studies, would have possessed actual or constructive knowledge of the concepts behind "Flirty Fishing" stemming from the scam's prominent use in well-known Bible passages, *see* ¶93, *supra*.

101. Mr. Rymer told Lamberth, her roommate Kristin West, Dr. Oldham and others that the Rymer family despised God and that his father, Mr. Walter Rymer, will "kill him" if Mr. Walter Rymer knew that Lincoln Rymer was associating with Christians. Mr. Rymer made it clear that the consequences of making a profession of faith would be "most dire". They all reassured Mr. Rymer that everything would be fine. Dr. Oldham stated that God protects believers.

102. Dr. Oldham was engaged in secret communications with a member of the staff or faculty of the UT Martin School of Engineering who engaged with Dr. Oldham in clandestine, unlawful conveyances of Mr. Rymer's student information. Mr. Rymer has multiple pieces of evidence, including an audio recording, that show Dr. Oldham was in possession of facts pertaining to Mr. Rymer's FERPA-PPRA protected student information that could only have been known by the UT Martin School of Engineering or Prof. Laura Sterrett.

103. Dr. Oldham failed to warn Mr. Rymer of a civil conspiracy against Mr. Rymer that could reasonably be expected to affect Mr. Rymer's spiritual well-being.

104. Dr. Oldham took affirmative action in furtherance of Flirty Fishing by sending Mr. Rymer an email noting how much it meant to Amanda Lamberth for Mr. Rymer to accompany her to worship services, or by failing to perform his fiduciary duty of addressing Lamberth's undue influence on Mr. Rymer's spiritual well-being. It would have been obvious to a reasonable person with Dr. Oldham's knowledge, an aged man wise in the ways of the world, what the source of Lamberth's influence was.

105. Upon information and belief, Dr. Oldham used the statutorily-protected student information, *see* ¶94, ¶102, i.a, *supra*, that Dr. Oldham obtained pertaining to Mr. Rymer to market religion to Mr. Rymer.

106. During the aforementioned events Mr. Rymer assumed Dr. Oldham lived by the commandments to be pure, holy, and honest contained in the spiritual literature that was officially espoused by Dr. Oldham, and Mr. Rymer was influenced by the general cultural perception that individuals holding positions such as Dr. Oldham's are pure and honest in their motives and not evil.

107. Dr. Oldham promised that God would protect Mr. Rymer and provide for Mr. Rymer's needs if Mr. Rymer stayed faithful to God, which, in conjunction with Lamberth's undue influence, caused Mr. Rymer to make a religious conversion to Mr. Rymer's detriment.

108. Dr. Oldham made statements to Mr. Rymer that caused Mr. Rymer to believe that the Church would be a surrogate family to Mr. Rymer, which, in conjunction with Lamberth's undue influence, caused Mr. Rymer to make a religious conversion to Mr. Rymer's detriment.

109. Dr. Oldham directed Mr. Rymer to "trust God with the consequences" of making a profession of faith and Mr. Rymer did so to his most grave detriment.

110. Dr. Oldham caused Mr. Rymer to take actions that any reasonable person would know would jeopardize the socioeconomic standing and spiritual and mental well-being of a person in Mr. Rymer's circumstances by directing Mr. Rymer, who displayed no means of income or support, to tell his father about the religious conversion knowing full well that Mr. Rymer's father despised God. Within an hour after being directed by Dr. Oldham to "be sure to tell [Walter Rymer]" about the conversion, Mr. Rymer placed a phone call to his parents to tell them the "good news". At approximately 8 P.M. on December 3, 2000, the 34th wedding anniversary of his parents, Mr. Rymer made the phone call. That call set off years of family strife that nearly caused the divorce of Mr. Rymer's parents and caused Mr. Rymer to be marginalized by many in his biological family. Mr. Rymer also lost all of his secular friends because of his conversion. Mr. Rymer's new Christian family encouraged Mr. Rymer to "hang in there" and that God would bless him and instructed him to keep the faith.

## Miscellaneous Facts Pertaining to either UTMill or "Flirty Fishing" Fraud

111. The engineering school at UT Martin was a nascent school seeking accreditation by ABET during the timeframe in which Mr. Rymer's First Amendment expressions occurred. When Lamberth met Mr. Rymer the engineering school was still seeking accreditation.

112. When Mr. Rymer met the defendants he was a gullible teenager from very rural Tennessee, was naive and lacked real-world street-smarts about grifters, con artists, and the wicked ways of the world, and had no means of learning the true facts pertaining to the defendants' undiscovered covert acts contrary to Mr. Rymer's interests, as neither his family nor the schools he attended had warned him about Flirty Fishing or set-ups-for-failure, shifting goalpost bullying, hazing, or any of the other covert psychological warfare tactics used against Mr. Rymer by the defendants. Nor did his family or educators instill in him real-world street-smarts about grifters, con artists, and the wicked ways of the world. Once Mr. Rymer met Lamberth, and was "in love" even if someone had presented to him the true facts based upon logic and reason, Mr. Rymer was too far gone mentally to have been reached by such an appeal. Furthermore, given God's biblical record of punishing some for their transgressions but not others, Mr. Rymer lacked knowledge and the means of acquiring knowledge of the truth as to the fact of whether "God w[ould] take [**him**] on" if **he** were to, once he discovered his injuries, commence legal action, as such knowledge resided solely in the mind of God, and Mr. Rymer lacked the means of accessing that knowledge.

113. At least seven (7) people have witnessed Mr. Rymer's memory or mental impairments over the past sixteen (16) years. Mr. Rymer suffered from partial memory loss pertaining to certain events from his days as a student at UT Martin. Mr. Rymer suffered repressed memories and PTSD stemming from his inability to succeed academically, family rejection, living in the NYC area during 9/11, life as a low-wage manual laborer, and ridicule by former classmates who hurled insults at him because he worked low-wage laboring jobs. Since 2012 Mr. Rymer has suffered from a disorder featuring sudden,

Case 3:16-cv-02711 Document 1 Filed 10/11/16 Page 22 of 59 PageID #: 22

sporadic uncontrollable jerking movements. In March 2013 Mr. Rymer was incapable of attending to any business as witnessed by two individuals at the time. During 2012, 2013, 2014, and part of 2015 Mr. Rymer was not able to consistently adhere to the objective standard of the reasonable person model and suffered from severe mental illness as witnessed by multiple individuals. In May of 2016, Mr. Rymer's brain disorder degenerated. Since then, while drowsy and prone, nearly every night he has symptoms that are common to, yet different from, epilepsy and rhythmic movement disorder (RMD).

114. Until long after college, Mr. Rymer lacked adequate character discernment skills because of the disability of his age, sheltered upbringing, and minimal social aptitude. In college Mr. Rymer lacked knowledge of the methods of psychological warfare or hazing that was secretly deployed against him. Because of the theoretical nature of the engineering curriculum and his dearth of practical experience stemming from not having worked in industry as a bona fide engineer, Mr. Rymer lacked the ability to gauge the feasibility of the student project. Despite exercising reasonable care and diligence, Mr. Rymer did not discover the retaliatory scheme until the dates aforementioned because Mr. Rymer, as an undergraduate student or as a graduate who had never worked as a bona fide engineer, did not obtain the real-world engineering expertise necessary to recognize the intrinsic impossibility of the school assignment. There was no comparable machine on the commercial market during the year 2000. Absent prior art invention to serve as a comparative benchmark, Mr. Rymer did not have the ability to discern whether or not the project was or wasn't feasible and had to rely upon the judgment of his adviser, Dr. Lemaster, whom Mr. Rymer especially trusted because Dr. Lemaster was a member of the Southern Baptist Church that Mr. Rymer was brought into by Amanda Lamberth. Also during this time period, Mr. Rymer was undergoing behavior modification by Lamberth and Dr. Oldham and their associates. By the Spring of 2000 the behavior modification had tranquilized him.

115. Mr. Rymer had zero contributory negligence. In order to have avoided becoming injured by the defendants, Mr. Rymer would have needed to have been continuously surrounded by a protective

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 23 of 59 PageID #: 23

entourage consisting of the following professionals: an expert in the field of psychological warfare, a licensed private investigator, and an experienced engineer or program manager in the specialized field of machine tool design and manufacturing.

116. Mr. Rymer was unable to succeed in this school project and his grades in his other classes suffered.

117. Mr. Rymer had expended an estimated 1000 hours on the project. After his failure, he considered his poor performance to be his own fault through lack of engineering ability, poor time management, and poor multi-tasking skills. He also lost confidence in his intellectual capabilities. He felt he just couldn't hack it. His already unsound mind degraded further, he made a religious conversion, dropped out of college, moved 1200 miles away to work in the NYC area for a $12/hr job.

118. On the evening of December 10, 2000 at approximately 8 P.M. defendant Dr. Oldham stated to Mr. Rymer, who was dropping out of college and leaving town, the following final parting words: "If you turn from God, God will take you on, but you'll still go to Heaven." Dr. Oldham then went on to say he'd seen it happen before…people who had turned from God and then died. Mr. Rymer was placed in a persistent state of fear by Dr. Oldham's statements which lasted until January 1, 2016 thereby preventing Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

119. Dr. Oldham, as a highly educated man holding a doctorate degree or experienced in the ways of the world or as a top pastor within a denomination that had been dwindling in numbers for decades without mass deaths of those so departing the faith possessed actual or constructive knowledge that God doesn't assassinate people whose faith has cooled, and that Dr. Oldham had the expectation that Mr. Rymer, a new convert, would be placed in a perpetual state of fear based upon such a dire warning.

120. Dr. Oldham, every subsequent preacher Mr. Rymer heard, and the Bible all taught that God blesses those who fear God which kept Mr. Rymer in the fear of God and prevented Mr. Rymer from discovering: his injuries, the true cause of those injuries, or the identity of a tortfeasor who caused each injury, or prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

121. In January 2012 during a phone call, Dr. Oldham told Mr. Rymer that Christians can expect hard times, that it's perfectly normal for his generation to suffer economically given the policies of the U.S. Government. Such statements prevented Mr. Rymer from discovering: his injuries, the true cause of those injuries, or the identity of a tortfeasor who caused each injury, or prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

122. Mr. Rymer was, additionally, under temporally unmitigated control by agents and by a de facto agent of defendant Dr. Oldham's principals. Such control prevented Mr. Rymer from discovering: his injuries, the true cause of those injuries, or the identity of a tortfeasor who caused each injury or prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

123. In September 2001, while living alone in the New York City area and working as a manual laborer, Mr. Rymer attempted to contact Dr. Oldham seeking spiritual guidance in the wake of the events of September 11, 2001. Mr. Rymer attempted to make contact via e-mail, the USPS, and telephone. All attempts to establish contact were unsuccessful. Mr. Rymer struggled to understand how a good God would allow 9/11. He soon remembered Dr. Oldham's dire warning and fear came upon

him that God would strike him dead for questioning God. This intense fear gripped Mr. Rymer without waver as he feared the Jekyll and Hyde dual-nature God of the Cross, from December 10, 2000 to January 1, 2016, when he finally saw The Light and found spiritual peace in the Morning Star. Until that time, such fear prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

124. In early 2013 Mr. Rymer discovered publicly available facts that frightened him pertaining to the affiliations of the leadership of the Southern Baptist Convention, the largest Protestant denomination in the World, and within whose top echelon Dr. Oldham is entrenched. The 2013 discoveries caused Mr. Rymer to reinterpret Dr. Oldham's aforementioned dire warning of death, *see* ¶118, *supra*, to be a veiled death threat, thus creating an additional dimension of fear thereby delaying Mr. Rymer until January 1, 2016 from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

125. Aforementioned acts of the defendants induced mental illness injuries in Mr. Rymer for seventeen (17) years thereby preventing Mr. Rymer from discovering: his injuries, the true cause of those injuries, or the identity of a tortfeasor who caused each injury or prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

126. The fear of the penalty of degree revocation for grounds stated in UT Martin's Student Handbook prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts, less than the aggregate set of facts, that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

127. The fear of Fed. R. Civ. P. 11 sanctions prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts, less than the aggregate set of facts, that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

128. Because of the defendants, Mr. Rymer suffers from bodily disfigurement in the form of stunted physical growth (diminutive stature), premature balding that began at age twenty (20), and crooked teeth. Because of the defendants, Mr. Rymer suffers from disfigurement of his psyche in the form of misanthropy which has caused Mr. Rymer to avoid all unnecessary contact with people. Both Mr. Rymer's bodily disfigurement and the disfigurement of his psyche have caused Mr. Rymer's total inability to find a mate and caused loss of consortium with consequential damages of destroyed generativity.

129. Mr. Rymer has been injured in his business or property, including damages to Mr. Rymer's business and professional reputations; the impairment of Mr. Rymer's interest in executed contracts, including those for the receipt of educational services from UT Martin and FFELP Promissory Notes executed to finance aforesaid educational services; Mr. Rymer's exclusion from entering into business or employment contracts; the loss of his property rights in the drawings, schematics, designs, prototypes, and other tangible works in a legitimate, feasible student project by the defendants' deprivation of honest services or the defendants' takings from Mr. Rymer of a legitimate, feasible student project; deprived Mr. Rymer of the pecuniary value of Mr. Rymer's time and financial investment in his higher education; deprived Mr. Rymer of the full use of his greatest asset -his intellect- by manipulating him into religious bondage, and Mr. Rymer's time, expenses, and court costs associated with exposing Laura Sterrett's and Dr. Oldham's pervasive fraud in Chancery proceedings.

130.– 150. [Reserved.]

## VII. LEGAL CLAIMS

### COUNT ONE: Accessing Protected Computers Without, or in Excess of, Authorization in Violation of Section 1030(a)(2)(C) of The Federal Computer Fraud and Abuse Act

151. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

152. In connection with the provision of computers for students, faculty, and staff, UT Martin owns and maintains one or more "protected computers" as the term is defined in the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2)(B). UT Martin's protected computers engage in two-way communications with students, faculty, and staff to the world-at-large through the internet.

153. On information and belief, Laura Sterrett or John Does 1 or 2 provided Dr. Oldham Mr. Rymer's information pertaining to Mr. Rymer's habits, conduct, activity, transactions, or acts from UT Martin's protected computers. Said information included details of Mr. Rymer's internet search history including his sexual and entertainment preferences.

154. On information and belief, Dr. Oldham used the aforementioned information to package and market the Christian religion to appeal to Mr. Rymer's specific interests.

155. Dr. Oldham or Laura Sterrett or John Does 1 or 2 accessed or caused to be accessed Mr. Rymer's aforementioned information in excess of authorization in violation of Section 1030(a)(2)(C) of The Federal Computer Fraud and Abuse Act.

156. By their actions, Dr. Oldham or Laura Sterrett or John Does 1 or 2 have intentionally accessed a computer without authorization, or in excess of authorization, and has thereby obtained information from a protected computer via an interstate or foreign communication, in violation of 18 U.S.C. §1030(a)(2)(C).

157. The damages suffered by Mr. Rymer as a result of the conduct of Laura Sterrett or Dr. Oldham, or John Does 1 or 2 include:

a.)the total loss of Mr. Rymer's financial investment in his higher education at a loss of, with

Case 3:16-cv-02711 Document 1 Filed 10/11/16 Page 28 of 59 PageID #: 28

finance charges, exceeding $25,000 (FY2000).

b.) the total loss of Mr. Rymer's value of his time invested or opportunity costs in pursuing his higher education, a value of approximately $100,000 (FY2000).

c.) hedonic damages from the loss of enjoyment of life from the year 1999 to the present day, of $5,000,000.

d.) the loss of Mr. Rymer's substantive rights of religious liberty. Damages assessed at a value of $5,000,000.

e.) the loss of Mr. Rymer's *Constantineau* property rights in his personal reputation, assessed at a value of $5,645,000.

## COUNT TWO: Violations of 42 U.S.C. §1985(3) - Conspiracy to interfere with civil rights: First Amendment Rights-Establishment Clause; *Casey*
### (Against Defendants Laura Sterrett and Dr. Oldham)

158. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

159. [Reserved.]

160. During the last week of August 2016 Mr. Rymer discovered that between the Fall semester of 1998 and 1999 Laura Sterrett set into motion a conspiracy to convert Mr. Rymer from practicing his religion to practicing her religion. She caused the conveyance to Dr. Oldham, who worked in Martin, Tenn. in the spiritual services industry, of Mr. Rymer's statutorily-protected student information pertaining to Mr. Rymer's internet searches performed on UT computer systems ("internet search history"), sexual preferences or entertainment preferences or student activism, or, in Laura Sterrett's misguided view, Mr. Rymer's use of foul language. Dr. Oldham then used this information to package and market the Christian religion to appeal to Mr. Rymer's specific interests. In February or March of 1999, in furtherance of the conspiracy, Amanda Lamberth '[went] in disguise…on the premises of [UT Martin]', intercepted Mr. Rymer, and "flirty fished" him. Through this conspiracy Mr. Rymer was converted from his religion to Prof. Laura Sterrett's religion. This secret conspiracy caused mental,

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 29 of 59 PageID #: 29

physical, and socioeconomic injuries to Mr. Rymer. This secret conspiracy caused the total loss of Mr. Rymer's financial investment in his education and lost opportunity costs. This secret conspiracy caused Mr. Rymer to be infringed of his rights to be free from State compulsion of religion pursuant to the Establishment Clause of the First Amendment to the U.S. Constitution. This secret conspiracy infringed on Mr. Rymer's *Casey* rights:

> "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992)

## COUNT THREE: Violations of 20 U.S.C. §1011a

161. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

162. At the time of the aforementioned student project Mr. Rymer was a full time student at UT Martin.

163. UT Martin, at the time of the aforementioned student project, received financial assistance under Title 20, Chapter 28 - *Higher Education Resources And Student Assistance* of the United States Code.

164. The assignment of Mr. Rymer to this project subjected Mr. Rymer to discrimination in retaliation for his aforementioned protected free speech.

165. The assignment of Mr. Rymer to the aforementioned student project was in violation of his First Amendment rights to free speech and his rights to equal protections under the 14th Amendment to the U.S. Constitution by Dr. Sterrett's willful failure to assign Mr. Rymer to a student project equivalent to other concurrently assigned student projects in terms of project complexity, requisite skill level, or funding or by the willful failure of Dr. Lemaster to preserve Mr. Rymer's *Constantineau* property rights by failing to grade Mr. Rymer on the assigned project on an equal plane with other so assigned students.

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 30 of 59 PageID #: 30

**COUNT FOUR: Violations of 20 U.S.C. §1011a**

166. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

167. Mr. Rymer was manipulated into making a religious conversion by UT Martin or its employees in retaliation for Mr. Rymer's protected free speech.

**COUNT FIVE: Civil RICO - Violations of RICO, 18 U.S.C. § 1962(c)**

168. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

169. At all relevant times, Mr. Rymer is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

170. At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

171. The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, through a multifaceted campaign of lies, fraud, threats and official corruption, to coerce Mr. Rymer into silencing his dissent on the engineering program and as retaliation for offending the wife of the School's dean or to coerce Mr. Rymer to drop out of college in order to prevent his dissent on the engineering program at UT Martin from spreading to other students. The latter such act by defendants protected their nascent school thereby directly benefiting the individual defendants' incomes for the benefit to the RICO Defendants and their co-conspirators. These RICO Defendants and their co-conspirators organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in the United States, funded primarily from the United States, and directed from the United States. Over the years they adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities. While the organization of the criminal enterprise has changed over

Page 31

time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

a. Defendants Dr. Sterrett or Laura Sterrett have been responsible for oversight of the scheme to defraud Mr. Rymer and infringe his rights, in particular, his right to honest services of public officials, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise—namely, approving Mr. Rymer's assignment to the aforementioned student project, providing Mr. Rymer's statutorily-protected student information to a private citizen with the intent that it be used to subdue Mr. Rymer via religion, spreading false and misleading information about Mr. Rymer's engineering aptitude, thereby conducting a massive campaign designed to silence Mr. Rymer's dissent or to coerce Mr. Rymer to drop out of college.

b. Defendant Dr. Lemaster was primarily responsible for managing the RICO Defendants' "wild goose chase" scheme to defraud Mr. Rymer, i.e. the aforementioned student project, exerting influence over Mr. Rymer, and colluding with school officials, and serving as the point man for the criminal enterprise for which he managed the nature and scope of the student project. Dr. Lemaster represented his role to also include arranging for project funding through a Grant or Center of Excellence.

c. Dr. Oldham served as a PSYOPS Specialist who manipulated Mr. Rymer into a religion for the purposes of achieving behavior modification in furtherance of the RICO Defendants' criminal enterprise.

172. The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "Enterprise." Each of the RICO Defendants participated in the operation or management of the Enterprise.

173. At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

***Pattern of Racketeering Activity***

174. The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

***Pattern of Racketeering Activity: Multiple Instances of Honest Services Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343, 1346***

175. As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to deprive Mr. Rymer of his intangible right of honest services or to defraud Mr. Rymer of his financial investments in his higher education or from any return thereon, and to mislead the greater public concerning Mr. Rymer's engineering aptitude by devising and executing a scheme, the aforementioned student project, designed to destroy Mr. Rymer's G.P.A. and reputation, and holding out, or causing to be held out, official school transcripts containing said G.P.A. as independent and neutral when they decidedly were not, thereby destroying Mr. Rymer's chances of an engineering career. The ultimate objective of the RICO Defendants' scheme or artifice to defraud was to increase or maintain their revenue stream or eligibility for receiving federal student loans by silencing Mr. Rymer's dissent or by coercing Mr. Rymer to drop out of college through takings of his *Constantineau* property rights in order to discredit his opinions or to prevent his dissent on the engineering program at UT Martin from spreading to other students. Such acts by defendants benefited their nascent school's revenues thereby directly benefiting the individual defendants' incomes and directly benefiting the organizational RICO Defendant.

176. In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent

Page 33

or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

a. emails to machine tool component manufacturers and instrument makers located across state lines- including Kistler AG;

b. mailings from machine tool component manufacturers and instrument makers located across state lines- including Kistler Instrument Corp., Diebold Goldring USA, Sotech Corp. et al.;

c. mailings of libelous grade reports and transcripts to Mr. Rymer and prospective employers of Mr. Rymer, including Paccar, Inc.

d. telephone communications to Kistler AG

e. fax transmissions from Setco Inc.

177. Mr. Rymer incorporates by reference the attached Exhibit C, which sets forth particular uses of wire and mail communications in furtherance of the RICO Defendants' scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1343, including which individual defendant caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

178. The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to increase or maintain their revenue stream or eligibility for receiving federal student loans by silencing Mr. Rymer's dissent or by coercing Mr. Rymer to drop out of college through takings of his *Constantineau* property rights in order to discredit his opinions or to prevent his dissent on the engineering program at UT Martin from spreading to other students. The RICO Defendants knowingly and intentionally prepared a self-serving assessment of Mr. Rymer's alleged engineering aptitude, and then knowingly and with the intent to deceive Mr. Rymer, the Rymer family, and prospective employers, caused that assessment to be mailed under the pretense that it was a grade report prepared by an independent authority, with the intent that those statements be believed. The RICO Defendants knowingly engaged in the aforementioned conduct with the intent to generate

despair in Mr. Rymer with the goal that Mr. Rymer would drop out of college and go away or to reform his behavior and silence his dissent, thereby allowing their nascent school to continue selling a service that they knew to be inadequately preparing non Co-op engineering students for 21st century real-world engineering careers.

179. The RICO Defendants' false and misleading statements have been relied on by Mr. Rymer, the Rymer family, prospective employers, or the community. Further, the RICO Defendants' false and misleading statements have caused Mr. Rymer the aforementioned substantial damages.

**COUNT SIX: Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d)**

180. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

181. The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. §1962(c) as described above, in violation of 18 U.S.C. §1962(d).

182. Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

183. Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

184. Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Mr. Rymer or injure Mr. Rymer's person or property. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs

174-178, *supra.*

185. As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), Mr. Rymer has been injured in his business or property, including damages to Mr. Rymer's business or professional reputations; the impairment of Mr. Rymer's interest in executed contracts, including those for the receipt of educational services from UT Martin and FFELP Promissory Notes executed to finance aforesaid educational services; the loss of his property rights in the drawings, schematics, designs, prototypes, and other tangible works in a legitimate, feasible student project by the RICO defendants' deprivation of honest services or the RICO defendants' takings from Mr. Rymer of a legitimate, feasible student project; deprived Mr. Rymer of the pecuniary value of Mr. Rymer's time and Mr. Rymer's financial investment in his higher education; deprived Mr. Rymer of the full use of his greatest asset -his intellect- by manipulating him into religious bondage, and Mr. Rymer's time, expenses, and court costs associated with exposing Laura Sterrett's and Dr. Oldham's pervasive fraud in Chancery proceedings.

186. Pursuant to 18 U.S.C. §1964(c), Mr. Rymer is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

**COUNT SEVEN: Violation of Title IX (20 U.S.C. § 1681, *et seq.*)**

187. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

188. The sex-based "Flirty Fishing" harassment articulated by Mr. Rymer's facts was so severe, pervasive, and objectively offensive that it deprived Mr. Rymer of access to educational opportunities or benefits provided by UT Martin.

189. UT Martin created or subjected Mr. Rymer to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because

a.) Mr. Rymer was a member of a protected class;

b.) he was subjected to sexual harassment in the form of "Flirty Fishing" by another student;

c.) he was subjected to "Flirty Fishing" sexual harassment based on his sex or sexual preferences;

d.) he was subjected to a hostile educational environment created by UT Martin's lack of policies and procedures to prevent such harassment and the School's failure to properly train its faculty and staff in Title IX and FERPA-PPRA compliance and from UT Martin's negligence in hiring;

e.)UT Martin negligently, wantonly, and/or intentionally hired, retained, or supervised incompetent personnel, who were allowed or encouraged to violate the law as was done to Mr. Rymer, and are thereby responsible to Mr. Rymer for the wrongs committed against Mr. Rymer and the damages suffered by Mr. Rymer. UT Martin's employees, agents, and/or representatives committed the violations of state and/or federal law as set forth in this Complaint.

f.) UT Martin was negligent or wanton in the hiring or retention of Laura Sterrett or Dr. Sterrett in allowing both persons to work simultaneously in the same department.

g.) UT Martin was negligent or wanton in the hiring or retention of Laura Sterrett or Dr. Sterrett while Dr. Sterrett was the Dean of the School of Engineering and she was a professor within the School of Engineering.

h.) UT Martin was negligent or wanton in the training of Laura Sterrett or other faculty or staff who provided Mr. Rymer's protected information, including but not limited to, Mr. Rymer's sexual preferences, to Dr. Oldham by failing to train or adequately train them in the compliance procedures and protocols mandated by Family Educational Rights and Privacy Act (FERPA), Protection of Pupil Rights Amendment (PPRA), or T.C.A. 10-7-504(a)(4)(A).

190. The negligent or wanton conduct of the aforementioned employees or agents of UT Martin

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 37 of 59 PageID #: 37

while acting in furtherance of each one's employment or agency and in the line and scope of each one's respective employment or agency lead to or proximately caused Mr. Rymer to suffer damages as set forth in this Complaint.

191. UT Martin and its officials had actual knowledge of the "Flirty Fishing" sexual harassment which was a machination set into motion or devised by themselves.

192. UT Martin's role in aforesaid sexual harassment, resulted in Mr. Rymer, on the basis of his sex or sexual preferences, from being excluded from participation in, being denied the benefits of, or being subjected to discrimination in UT Martin's education program in violation of Title IX. Mr. Rymer was excluded from participation in UT Martin's education program by the "Flirty Fishing" sexual harassment which caused Mr. Rymer to make a religious conversion which contributed to him dropping out of college. Mr. Rymer was denied the benefits of UT Martin's education program because the "Flirty Fishing" sexual harassment substantially distracted Mr. Rymer from his studies. Mr. Rymer's sexual preferences subjected him to targeted discrimination in UT Martin's education program, as those preferences were used against him to diminish the quality of his college experience.

193. Mr. Rymer has suffered emotional distress and psychological damage, and his character and standing in his community have suffered from the harassment fostered as a direct and proximate result of UT Martin's deliberate violations of his rights under Title IX.

**COUNT EIGHT: Common Law Fraud**

194. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

195. In connection with dealings with Mr. Rymer, Laura Sterrett or Dr. Oldham or their co-conspirators intentionally and recklessly employed devices, schemes, and artifices to defraud, made material misrepresentations, failed to disclose material information, and engaged in acts, practices, and

Case 3:16-cv-02711 Document 1 Filed 10/11/16 Page 38 of 59 PageID #: 38

a course of business which operated as a fraud or deceit on Mr. Rymer, all in violation of Tennessee's common law of fraud.

196. Mr. Rymer reasonably relied on Dr. Oldham's representations and those of the "bait girl", Amanda Lamberth, and Mr. Rymer was unaware of the true facts.

197. Mr. Rymer has been damaged as a result of Laura Sterrett's or Dr. Oldham's or their accomplices' misconduct.

198. Mr. Rymer is entitled to recover compensation from Laura Sterrett or Dr. Oldham or their co-conspirators.

199. Mr. Rymer is also entitled to recover punitive damages because of Laura Sterrett's or Dr. Oldham's or their accomplices' willful fraud and misconduct.

**COUNT NINE: Common Law Fraud**

200. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

201. In connection with his dealings with Mr. Rymer, Dr. Lemaster or Dr. Sterrett intentionally and recklessly employed devices, schemes, and artifices to defraud, made material misrepresentations, failed to disclose material information, and engaged in acts, practices, and a course of business which operated as a fraud or deceit on the plaintiffs, all in violation of Tennessee's common law of fraud.

202. Mr. Rymer reasonably relied on Dr. Lemaster's representations and was unaware of the true facts.

203. Mr. Rymer has been damaged as a result of Dr. Lemaster's or Doug Sterett's misconduct.

204. Dr. Sterrett is liable for the acts of Dr. Lemaster pursuant to the doctrine of *respondeat superior* because Dr. Lemaster was an agent of Dr. Sterrett.

205. Mr. Rymer is entitled to recover from Dr. Lemaster or Dr. Sterrett compensation for

a.) the total loss of Mr. Rymer's financial investment in his higher education at a loss of, with finance charges, exceeding $25,000 (FY2000),

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 39 of 59 PageID #: 39

b.) the total loss of Mr. Rymer's value of his time invested in pursuing his higher education, or opportunity costs, a value of approximately $100,000 (FY2000),

c.) hedonic damages from the loss of enjoyment of life from the year 2000 to the present day, assessed at a value of $4,710,000.

d.) the loss of Mr. Rymer's *Constantineau* property rights in his personal reputation, assessed at a value of $5,645,000.

206. Mr. Rymer is also entitled to recover punitive damages because of Dr. Lemaster's or Dr. Sterrett's willful fraud and misconduct.

**COUNT TEN: Invasion of Privacy**

207. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

208. Laura Sterrett or John Doe 1 invaded Mr. Rymer's privacy when either disclosed or caused to be disclosure to Dr. Oldham, Mr. Rymer's internet searches performed on UT computer systems ("internet search history"), sexual preferences, entertainment preferences, student activism, and, in Laura Sterrett's misguided opinion, use of foul language.

209. Mr. Rymer had a legal right to have his student information kept confidential.

210. Mr. Rymer's student information was statutorily protected under Family Educational Rights and Privacy Act (FERPA) or Protection of Pupil Rights Amendment (PPRA) or T.C.A. 10-7-504(a)(4)(A).

211. The publication of private information for the use of furthering a scam that exploited women to lure a teenager into a religion would be highly objectionable to an average person and amounted in this case to an egregious invasion of privacy which has visited great mental and emotional injury upon Mr. Rymer.

**COUNT ELEVEN: Assault**

212. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

213. At all times relevant and material hereto, and in furtherance of the conspiracy to retaliate against and control Mr. Rymer, Dr. Oldham, created fear of bodily harm to Mr. Rymer, by:

a. Issuing a death threat to Mr. Rymer: "If you turn from God, God will take you on, but you'll still go to Heaven." Dr. Oldham then went on to say he'd seen it happen before…people who had turned from God and then died.

b. Dr. Oldham caused the physical separation of Mr. Rymer from his family against Mr. Rymer's free will by knowingly indoctrinating Mr. Rymer with a religion, an incendiary device, that Dr. Oldham knew was counter to the Rymer family's tradition, causing Mr. Rymer to take refuge from the family turmoil by fleeing the State of Tennessee and resettling in New Haven, Connecticut.

c. Dr. Oldham recklessly endangered Mr. Rymer by instructing Mr. Rymer to "be sure to tell your father" about the religious conversion knowing full well that Mr. Rymer's father despised God.

214. At all times relevant and material hereto, Dr. Oldham's conduct placed Mr. Rymer in reasonable fear of bodily harm.

215. At all times relevant and material hereto, Dr. Oldham knew or should have known that his conduct would place Mr. Rymer in reasonable fear of bodily harm.

216. At all times relevant and material hereto, Mr. Rymer suffered damages as a direct and proximate result of Dr. Oldham's conduct.

217. As a direct and proximate cause of said assaults upon Mr. Rymer by Dr. Oldham, in furtherance of the conspiracy to retaliate against and control Mr. Rymer, Mr. Rymer has suffered damages for which Dr. Oldham or Laura Sterrett, or John Does 1 or 2 are liable.

218. As a result of the above, Dr. Oldham or Laura Sterrett, or John Does 1 or 2 are liable to Mr. Rymer for damages.

## COUNT TWELVE: Malicious Harassment

219. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

220. At all times relevant and material hereto, and in furtherance of the conspiracy to retaliate against or control Mr. Rymer, Dr. Sterrett or Laura Sterrett or Dr. Lemaster, out of malice, ill-will, hatred, or spite over the notion that Mr. Rymer offended Laura Sterrett by referring to a tool by its proper name, the "bastard file", or that he had the gall to ask his professors to incorporate "hands-on" engineering into the curriculum, unlawfully, maliciously harassed Mr. Rymer in the following ways:

a. by Laura Sterrett's marital influence over her husband who then approved Mr. Rymer to the aforementioned impossible student project;

b. by influencing third parties' opinions of Mr. Rymer by causing the dissemination of false information concerning Mr. Rymer (i.e. his grades) which resulted in loss of income and livelihood;

c. by influencing or inducing the Rymer family or third parties to marginalize or cut-off or disown Mr. Rymer via aforementioned student project or aforesaid defamation through dissemination of false information concerning Mr. Rymer (i.e. his grades);

d. by inducing physical or mental illness in Mr. Rymer through aforementioned student project or aforesaid defamation through dissemination of false information concerning Mr. Rymer (i.e. his grades) thereby negatively affecting Mr. Rymer's status in the community, thereby harming Mr. Rymer, and negatively affecting Mr. Rymer's personal relationships and negatively affecting the ability of Mr. Rymer to create and sustain new personal and professional relationships;

221. As a direct and proximate cause of said malicious, ill-willful, hateful, or spiteful acts by the defendants' conspiracies to retaliate against or control Mr. Rymer, Mr. Rymer has suffered damages for which the defendants are liable.

222. The defendants knew or should have known said acts against the plaintiffs would damage

Mr. Rymer.

223. As a result of the above, Mr. Rymer is entitled to actual and punitive damages from defendants.

**COUNT THIRTEEN: Malicious Harassment**

224. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

225. At all times relevant and material hereto, and in furtherance of the conspiracy to retaliate against or control Mr. Rymer, Dr. Oldham or Laura Sterrett, out of malice, ill-will, hatred, or spite over the notion that Mr. Rymer referred to a tool by its proper name, the "bastard file", or that he had the gall to ask his professors to incorporate "hands-on" engineering into the curriculum, unlawfully, maliciously harassed Mr. Rymer in the following ways:

a. by setting into motion or furthering a scheme to get Mr. Rymer under the dominion of The Church;

b. by Dr. Oldham recklessly endangering Mr. Rymer by instructing Mr. Rymer to "be sure to tell your father" about the aforementioned religious conversion knowing full well that Mr. Rymer's father despised God;

c. by Laura Sterrett's action to set into motion the clandestine provision to Dr. Oldham of Mr. Rymer's FERPA-PPRA aforesaid protected student information

d. by influencing or inducing the Rymer family or third parties to marginalize or cut-off or disown Mr. Rymer by inducing mental illness through religious bondage;

e. by inducing mental illness in Mr. Rymer through religious bondage thereby negatively affecting Mr. Rymer's status in the community, thereby harming Mr. Rymer, and negatively affecting Mr. Rymer's personal relationships and negatively affecting the ability of Mr. Rymer to create and sustain new personal and professional relationships;

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 43 of 59 PageID #: 43

226. Said malicious, ill-willful, hateful, or spiteful acts by defendants covertly, psychologically reprogrammed Mr. Rymer hindering his free exercise or enjoyment of his constitutional rights protected by the Tennessee Constitution and fundamental rights protected by the United States Constitution and rights created by *Casey* (505 U.S. 833).

227. As a direct and proximate cause of said malicious, ill-willful, hateful, or spiteful acts by the defendants' conspiracy to retaliate against or control Mr. Rymer, Mr. Rymer has suffered damages for which the defendants are liable.

228. The defendants knew or should have known said acts against the plaintiffs would damage Mr. Rymer.

229. As a result of the above, Mr. Rymer is entitled to actual and punitive damages from defendants.

**COUNT FOURTEEN: Intentional Infliction of Emotional Distress**

230. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

231. Defendants Laura Sterrett or John Doe 1 and Dr. Oldham committed the tort of intentional infliction of emotional distress when they entered into a civil conspiracy and participated in unlawful conveyance of Mr. Rymer's protected student information or devised the "Flirty Fishing" scheme with the goal of stripping Mr. Rymer of his liberty to "define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."

232. Dr. Oldham, knew that the Rymer family vehemently despised God and once Lincoln was duped into religion Dr. Oldham intentionally caused Mr. Rymer to verbally broadcast the announcement his new faith with specific instructions to tell the patriarch of the Rymer family and to "trust God with the consequences."

233. Dr. Oldham, a man wise in the ways of the world, possessed constructive knowledge that Lincoln Rymer would be harmed by the intentional and reckless directive to inform the patriarch of the

Case 3:16-cv-02711 Document 1 Filed 10/11/16 Page 44 of 59 PageID #: 44

Rymer family of his new faith.

234. Dr. Oldham, a man wise in the ways of the world, possessed constructive knowledge that Lincoln Rymer would be harmed by the intentional and reckless use of "Flirty Fishing".

235. The action of exploiting women as bait to lure teenagers into religion is so outrageous that it is not tolerated by civilized society.

236. The action of directing a college student, who had no visible means of support and whose father was known to despise God, to tell about said student's new faith to his father, the one person in the world who'd have the means and vested self-interest to give said student a "leg-up" in life, is so outrageous that it is not tolerated by civilized society.

237. These outrageous actions have resulted in serious socioeconomic damages and mental injury and emotional distress to Mr. Rymer.

238. Defendant UT Martin is liable for Laura Sterrett's or John Doe 1's or John Doe 2's actions based on agency liability and the doctrine of respondeat superior because Laura Sterrett or John Does 1 or 2 were acting in the scope of his or her employment with UT Martin and UT Martin had a right to control their actions. Laura Sterrett's or John Doe 1's or John Doe 2's access of Mr. Rymer's protected information was for the purposes of studying the habits of Mr. Rymer and the information obtained was used for the purposes of retaliating against Mr. Rymer for his protected First Amendment expressions pertaining to the engineering curriculum or his use of the proper technical term, "bastard file" during a tool inventory. These purposes exceeded the scope of permissible access under the Family Educational Rights and Privacy Act (FERPA) and the Protection of Pupil Rights Amendment (PPRA) and such computer espionage was in excess of authorization in violation of Section 1030(a)(2)(C) of The Federal Computer Fraud And Abuse Act. UT Martin failed to adequately train Laura Sterrett or John Does 1 or 2 as to what constitutes permissible access of student records or failed to adequately train one or more of them in protocols pertaining to the handling of protected student information under the Family

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 45 of 59 PageID #: 45

Educational Rights and Privacy Act (FERPA) and the Protection of Pupil Rights Amendment (PPRA).

**COUNT FIFTEEN: Civil Conspiracy**

239. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

240. Laura Sterrett and Dr. Oldham, either acting directly together, or through a facilitating middleman, John Doe 1, acted in concert to profit by means of their unlawful or tortious conduct toward Mr. Rymer.

241. Laura Sterrett or John Doe 1 and Dr. Oldham shared this same conspiratorial objective.

242. Laura Sterrett or John Doe 1 and Dr. Oldham took overt acts in furtherance of the conspiracy including but not limited to the unlawful conveyance of protected student information or devising the "Flirty Fishing" scheme.

243. As a direct and proximate result of the conspiracy, Mr. Rymer became of unsound mind, lost precious time that could have been devoted to his college studies, sustained enormous socioeconomic losses, was held to public and private ridicule and contempt, and has suffered injury to his reputation, humiliation, emotional distress, and mental anguish. Mr. Rymer was also deprived of his *Casey* liberty to "define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."

**COUNT SIXTEEN: Intentional Infliction of Emotional Distress**

244. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

245. Defendants Dr. Lemaster and Dr. Sterrett committed the tort of intentional infliction of emotional distress when they entered into a civil conspiracy to a.) assign Mr. Rymer to an impossible student project despite both professors possessing actual or constructive knowledge of the project's lack of feasibility or b.) raise the goal post on an already impossible task despite both professors possessing actual or constructive knowledge of the project's lack of feasibility.

246. The action of knowingly assigning a college student an impossible assignment as a

Case 3:16-cv-02711 Document 1 Filed 10/11/16 Page 46 of 59 PageID #: 46

graduation requirement or the approval thereof is so outrageous that it is not tolerated by civilized society.

247. Dr. Lemaster's or Sterrett's action of raising the goal post on an already impossible task is so outrageous that it is not tolerated by civilized society.

248. These outrageous actions have resulted in serious mental injury and emotional distress to Mr. Rymer.

249. Dr. Sterrett is liable for Dr. Lemaster's actions based on agency liability and the doctrine of respondeat superior because Dr. Lemaster was acting in the scope of his employment under his supervisor Dr. Sterrett and Dr. Sterrett had a right to control Dr. Lemaster's actions.

250. UT Martin is liable for Dr. Lemaster's actions and Dr. Sterrett's actions based on agency liability and the doctrine of respondeat superior because Dr. Lemaster and Sterrett were acting in the scope of their employment with UT Martin and UT Martin had a right to control their actions.

**COUNT SEVENTEEN: Civil Conspiracy**

251. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

252. Dr. Lemaster and Dr. Sterrett acted in concert to profit by means of their unlawful or tortious conduct toward Mr. Rymer.

253. Dr. Lemaster and Dr. Sterrett shared this same conspiratorial objective.

254. Dr. Lemaster and Dr. Sterrett took overt acts in furtherance of the conspiracy including but not limited to assigning Mr. Rymer to an impossible student project despite both professors possessing actual or constructive knowledge of the project's lack of feasibility and raising the goal post on an already impossible task.

255. As a direct result of the conspiracy, Mr. Rymer lost precious time and energy which could have been devoted to his other college coursework, sustained enormous socioeconomic losses, deprived of the benefits of public confidence and social acceptance, was held to public and private ridicule and

contempt, and has suffered injury to his reputation, humiliation, emotional distress, and mental anguish.

**COUNT EIGHTEEN: Breach of Fiduciary Duty**

256. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

257. At the time of the aforementioned student project, Dr. Robert Lemaster was Mr. Rymer's Academic Adviser and his Senior Project Adviser and had a fiduciary duty to Mr. Rymer.

258. Dr. Lemaster possessed multiple engineering degrees, including a Ph.D., and possessed decades of experience working in the aerospace or defense sectors which would have given him actual or constructive knowledge of facts regarding what is and what isn't a reasonable student project.

259. Dr. Lemaster failed to disclose to Mr. Rymer that the student project was not a feasible assignment by failing to disclose material facts about the level of engineering skill, manpower, and financial resources necessary to pull off a project of the magnitude of the aforementioned student project.

260. Because of Dr. Lemaster's breach of fiduciary duty, Mr. Rymer sustained aforementioned catastrophic injuries.

**COUNT NINETEEN: Breach of Fiduciary Duty**

261. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

262. From the Fall of 1999 to August 3, 2003 Dr. Oldham was either spiritual counselor or pastor to Mr. Rymer who was either counselee or parishioner to Dr. Oldham. During such times Dr. Oldham provided advice on spiritual matters for the ostensible benefit of Mr. Rymer. Such matters existing within the scope of the relationship establish Dr. Oldham possessing a fiduciary duty to Mr. Rymer.

263. Despite having inside information, as evidenced by Dr. Oldham's knowledge of content from Mr. Rymer's statutorily-protected student information, Dr. Oldham failed to warn Mr. Rymer that staff or faculty within the UT Martin School of Engineering had ill will towards Mr. Rymer. Such

Page 48

notice falls within the realm of necessary disclosure within the fiduciary relationship because the knowledge of the existence of such ill will would cause a reasonable person in Dr. Oldham's position to fear for Mr. Rymer's emotional, mental, physical, and financial well-being thus affecting the spiritual well-being of his counselee, Mr. Rymer.

264. An additional breach of fiduciary duty arises from Dr. Oldham's role in the "Flirty Fishing" fraud. Dr. Oldham had a fiduciary duty to not act in furtherance of the "Flirty Fishing" fraud or to address the conflict of Mr. Rymer's spiritual interests in being brought to Church by a gorgeous woman. Dr. Oldham, being an expert in biblical studies, would have possessed actual or constructive knowledge of the story of Balaam's use of gorgeous women to lure Israelite men to worship Baal. Likewise, Dr. Oldham would have possessed actual or constructive knowledge of the story of the daughter of the King of Ammon luring King Solomon to worship Baal. As such, Dr. Oldham would have known the immense power Ms. Lamberth held over Mr. Rymer, and he failed to address with Mr. Rymer her undue influence on Mr. Rymer's spiritual development.

265. An additional breach of fiduciary duty arises from Dr. Oldham's failure to provide spiritual guidance to Mr. Rymer in the wake of the events of September 11, 2001 while Mr. Rymer was living alone in the NYC area, having been a Christian only for nine (9) months. Mr. Rymer wanted to know why God allowed 9/11. If Dr. Oldham had responded, though speculative, the metamorphosis of Mr. Rymer's faith may have accelerated to his present beliefs, thereby sparing Mr. Rymer more than fifteen (15) years of mental and spiritual bondage.

266. Because of Dr. Oldham's breach of fiduciary duty, Mr. Rymer sustained aforementioned catastrophic injuries.

**COUNT TWENTY: Defamation – Libel**

267. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

268. Dr. Sterrett or Dr. Lemaster communicated or caused to be communicated defamatory

Case 3:16-cv-02711 Document 1 Filed 10/11/16 Page 49 of 59 PageID #: 49

statements about Mr. Rymer, the published grades during the year 1999 or 2000, to a third person, UT Martin Academic Records and Registrar or caused defamatory statements about Mr. Rymer, the published grades during the year 1999 or 2000, to be communicated to third persons including the Rymer family and prospective employers who demanded Mr. Rymer provide them records containing said statements.

269. These defamatory statements were read by aforesaid third persons, who believed the statements to be factual and understood that the statements referred to Mr. Rymer.

270. Dr. Sterrett or Dr. Lemaster knew that these statements were false before they published them or caused them to be published, thereby showing malicious intent.

271. These defamatory statements directly caused damage to Mr. Rymer.

272. Published grades attributed to Mr. Rymer during the year 1999 or 2000 were false for the aforementioned reasons, viz., the student project scam or Flirty Fishing harassment, and were not discovered by Mr. Rymer to be false until aforementioned times.

273. The defamatory material is libel *per se* because it is calculated on its face to cast aspersions on the professional competence of Mr. Rymer.

274. These false statements caused Mr. Rymer to be deprived of the benefits of public confidence and social acceptance, to sustain enormous socioeconomic loss, be held to public ridicule, and suffer personal humiliation, emotional distress and pain and suffering.

**COUNT TWENTY-ONE: Violation of The Tennessee Human Rights Act**

275. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

276. UT Martin, as an entity employing eight or more persons within the State, qualifies as an employer under the Tennessee Human Rights Act ("THRA").

277. UT Martin committed multiple discriminatory practices in violation of the THRA by permitting Laura Sterrett to disclose Mr. Rymer's work-study conduct, viz. the tool inventory that

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 50 of 59 PageID #: 50

inadvertently offended her (*see* ¶4 *supra*), to Dr. Oldham, a private citizen.

278. UT Martin is liable for the manager's actions based on agency liability and the doctrine of respondeat superior because Laura Sterrett acting as Mr. Rymer's manager was acting in the course of her employment with UT Martin and UT Martin had a right to control her actions.

279. UT Martin failed to protect Mr. Rymer's interest, personal dignity and his right to freedom from humiliation, as required by the THRA, when his supervisor, Laura Sterrett divulged Mr. Rymer's work-study conduct, viz. the tool inventory that inadvertently offended her, to Dr. Oldham.

280. These acts of in violation of the THRA caused severe mental and emotional damages and financial losses.

**COUNT TWENTY-TWO: Negligent Hiring, Training, or Supervision of Employees or Agents**

281. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

282. UT Martin negligently, wantonly, and/or intentionally hired, retained, or supervised incompetent personnel, who were allowed or encouraged to violate the law as was done to Mr. Rymer, and are thereby responsible to Mr. Rymer for the wrongs committed against Mr. Rymer and the damages suffered by Mr. Rymer. UT Martin's employees, agents, and/or representatives committed the violations of state and/or federal law as set forth in this Complaint.

283. UT Martin was negligent or wanton in the hiring or retention of Laura Sterrett or Dr. Sterrett in allowing both persons to work simultaneously in the same department.

284. UT Martin was negligent or wanton in the hiring or retention of Laura Sterrett or Dr. Sterrett while Dr. Sterrett was the Dean of the School of Engineering and she was a professor within the School of Engineering.

285. UT Martin was negligent or wanton in the training of Laura Sterrett or other faculty or staff who provided Mr. Rymer's protected information to Dr. Oldham by failing to train or adequately train them in the compliance procedures and protocols mandated by Family Educational Rights and

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 51 of 59 PageID #: 51

Privacy Act (FERPA), Protection of Pupil Rights Amendment (PPRA), and T.C.A. 10-7-504(a)(4)(A).

286. The negligent or wanton conduct of those employees or agents of UT Martin while acting in furtherance of each one's employment or agency and in the line and scope of each one's respective employment or agency lead to or proximately caused Mr. Rymer to suffer damages as set forth in this Complaint.

**COUNT TWENTY-THREE: Breach of Contract**

287. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

288. UT Martin entered into a contract to provide educational services to Mr. Rymer for the consideration of signed FFELP Promissory Notes. Included in said educational services was the provision of an Academic Adviser and a Senior Project Adviser. The University provided both Advisers in the form of one person, Dr. Robert Lemaster.

289. In breach of the contract's implied covenant of good faith and fair dealing, Dr. Lemaster breached his fiduciary duty to Mr. Rymer in both of Dr. Lemaster's dual advisory capacities. Said breaches also constitute violations of 18 U.S.C. §1346 honest services fraud.

290. Said breaches rendered the value of the educational services received by Mr. Rymer worthless and caused Mr. Rymer to sustain actual and consequential damages.

**COUNT TWENTY-FOUR: Breach of Contract - Promissory Estoppel**

291. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

292. By promising to provide a forum of academic freedom where Mr. Rymer can pursue his education free from governmental retaliation for his religious beliefs or free speech activities and by promising to treat Mr. Rymer equally to all students, UT Martin caused Mr. Rymer to enroll in their school for the consideration of signed FFELP Promissory Notes and detrimentally rely upon their promises.

293. Because of UT Martin's actions, Mr. Rymer has suffered, and continues to suffer, economic

Case 3:16-cv-02711   Document 1   Filed 10/11/16   Page 52 of 59 PageID #: 52

injury and irreparable harm. He, therefore is entitled to an award of monetary damages and equitable relief. Mr. Rymer also seeks punitive damages.

294. Mr. Rymer is entitled to the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

295. The detriment Mr. Rymer suffered in reliance on the promises to not retaliate against him for his religious beliefs or free speech activities were catastrophic and permanent.

296. UT Martin, through its employees, Dr. Sterrett and Dr. Lemaster would reasonably expect that Mr. Rymer acting in reliance on these guarantees would suffer catastrophically given the aforementioned abuse either wrought or caused to be wrought upon Mr. Rymer.

297. Mr. Rymer acted reasonably in his justifiable reliance on the promises of freedom of speech and expression contained within the U.S. Constitution and the Tennessee State Constitution.

**COUNT TWENTY-FIVE: Breach of Contract - Promissory Estoppel**

298. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

299. By promising that Christians are required to materially help the needy, Dr. Oldham caused Mr. Rymer to make a religious conversion and detrimentally rely upon Dr. Oldham's promises.

300. [Reserved.]

301. By promising that "all things work together for good to them that love God", or to "trust God with the consequences" of making a profession of faith, Dr. Oldham caused Mr. Rymer to make a religious conversion and detrimentally rely upon Dr. Oldham's promises.

302. By promising that "all things work together for good to them that love God", or to "trust God with the consequences", Dr. Oldham caused Mr. Rymer to tell the Rymer family and his secular friends about his religious conversion and detrimentally rely upon Dr. Oldham's promises.

303. By promising to Mr. Rymer that God would kill Mr. Rymer if Mr. Rymer "turned from God", Dr. Oldham caused Mr. Rymer to remain under religious control and detrimentally rely upon Dr.

Oldham's promises.

304. Because of Dr. Oldham's promises, Mr. Rymer has suffered, and continues to suffer, economic injury and irreparable harm. He, therefore is entitled to an award of monetary damages and equitable relief.  Mr. Rymer also seeks punitive damages.

305. Mr. Rymer is entitled to the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

306. The detriment Mr. Rymer suffered in reliance on the aforementioned promises were catastrophic and permanent.

307. Dr. Oldham would reasonably expect that Mr. Rymer acting in reliance on these promises would suffer catastrophically given that Mr. Rymer had told Dr. Oldham on many occasions that the Rymer family despised God and a profession of faith would place Mr. Rymer in harm's way.

308. Mr. Rymer acted reasonably in his justifiable reliance on the promises of Dr. Oldham given the fiduciary duty Dr. Oldham had to Mr. Rymer or the culturally-engrained trust in members of the clergy.

**COUNT TWENTY-SIX: Fraudulent or Intentional Misrepresentation**

309. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

310. Dr. Lemaster represented the student project to be feasible.

311. The student project was not feasible at the time.

312. Feasibility of the project was a material fact in that Mr. Rymer would have objected to the project or sought relief had he known that the student project was not feasible.

313. Dr. Lemaster possessed actual or constructive knowledge that the student project was not feasible.

314. Mr. Rymer reasonably relied upon Dr. Lemaster's representation that the student project was feasible.

315. Mr. Rymer suffered aforementioned catastrophic injuries.

316. Because of Dr. Lemaster's misrepresentations, Mr. Rymer has suffered, and continues to suffer, economic injury and irreparable harm. He, therefore is entitled to an award of monetary damages and equitable relief. Mr. Rymer also seeks punitive damages.

**COUNT TWENTY-SEVEN: Fraudulent or Intentional Misrepresentation**

317. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

318. Dr. Oldham represented to Mr. Rymer that God would kill Mr. Rymer if Mr. Rymer "turned from God" and that "all things work together for good to them that love God".

319. Dr. Oldham, as a co-conspirator in the Flirty Fishing conspiracy thus responsible for the acts of all those conspirators, represented that Amanda Lamberth was interested in Mr. Rymer accompanying her to numerous events for legitimate social purposes.

320. These representations were false when Dr. Oldham made them.

321. Had Mr. Rymer known that God wouldn't kill him if he "turned from God" he would have lived life differently and might have abandoned that faith after 9/11. Had Mr. Rymer known that "all things [don't] work together for good to them that love God" he would've lived life differently. Had he known that Amanda Lamberth's true intent was to covertly manipulate him into religion he would have avoided the entire scam completely and never met Dr. Oldham.

322. Dr. Oldham possessed actual or constructive knowledge that God doesn't kill people who "[turn] from God".

323. Mr. Rymer reasonably relied upon Dr. Oldham's representations because of the fiduciary duty Dr. Oldham had to Mr. Rymer or because of culturally-engrained trust in members of the clergy.

324. Because of Dr. Oldham's misrepresentations, Mr. Rymer has suffered, and continues to suffer, economic injury and irreparable harm. He, therefore is entitled to an award of monetary damages and equitable relief. Mr. Rymer also seeks punitive damages.

**COUNT TWENTY-EIGHT: Tortious Interference with Contractual Relations**

325. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

326. By reporting libelous grades attributed to Mr. Rymer, UT Martin or Dr. Lemaster or Dr. Sterrett, caused prospective employers to decline to offer Mr. Rymer employment contracts.

327. UT Martin or Dr. Lemaster or Dr. Sterrett have, without privilege or justification, interfered with Mr. Rymer's contractual relationships with prospective employers.

328. Because of UT Martin's or Dr. Lemaster's or Dr. Sterrett's actions, Mr. Rymer has suffered, and continues to suffer, economic injury and irreparable harm. Mr. Rymer, therefore, is entitled to an award of monetary damages, including punitive damages against said Defendants in their individual capacities for their outrageous actions against Mr. Rymer, and equitable relief.

**COUNT TWENTY-NINE: Fraudulent Inducement to Contract**

329. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

330. UT Martin advertised in its marketing literature that its Professors care about the students.

331. UT Martin is held to the First Amendment of the U.S. Constitution and to the Tenn. Constitution. Both Constitutions provide the right to free speech and the right to be free from State-sponsored religion, and both rights are implied contractual terms pursuant to the common law principle that contracts incorporate the law in force at the time of the agreement.

332. UT Martin knows that it has employees who are only there for a paycheck and don't care about the customers. UT Martin's employees, Laura Sterrett, Dr. Sterrett, or Dr. Lemaster knowingly infringed on Plaintiff's implied contractual rights to free speech or freedom from State-sponsored religion.

333. UT Martin advertised the false statements in order to entice prospective customers, including Mr. Rymer, to purchase educational services from UT Martin.

334. Mr. Rymer and his father reasonably relied on the statements because of the family's long

history with UT Knoxville and reasonably assumed that UT Martin was worthy of the UT name and hence was a reputable business or reasonably relied on the Constitutions of United States and Tennessee.

335. Mr. Rymer sustained aforementioned catastrophic injuries that he would not have sustained had he not purchased those educational services from UT Martin in reliance on the aforesaid statements.

## COUNT THIRTY: Fraudulent Inducement to Contract

336. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

337. Dr. Oldham sold Mr. Rymer membership into his organization based upon on deceptive acts in commerce. Flirty Fishing was a bait and switch sales tactic that enabled Dr. Oldham to sell his goods and services to Mr. Rymer. Dr. Oldham sold Mr. Rymer membership into his organization based upon on covenants in his marketing literature, The Bible, that direct members of such global organization to materially help the needy. Goods and services were exchanged for the consideration of Mr. Rymer's liberty and weekly payments in the form of tithes and offerings.

338. Dr. Oldham knew that Flirty Fishing is a fraudulent inducement. Dr. Oldham possessed actual or constructive knowledge that, in general, the members of aforesaid global organization don't materially help the needy, as evidenced by the fact that aforesaid organization has existed for nearly 2,000 years and has 2.2 billion members, nearly a third (31 percent) of the earth's population, and yet poverty and hunger is rampant.

339. Dr. Oldham advertised the false statements in order to entice Mr. Rymer, to become a member of aforesaid organization.

340. Mr. Rymer reasonably relied on the statements because of Mr. Oldham's fiduciary duty status to him or because of culturally-engrained trust in members of the clergy.

341. Mr. Rymer sustained aforementioned catastrophic injuries that he would not have sustained

Page 57

had he not entered into contract in reliance on the aforesaid statements.

## COUNT THIRTY-ONE: Violations of 42 U.S.C. §1985(3) - Conspiracy to interfere with civil rights: Thirteenth Amendment Rights - (Against Defendants Laura Sterrett and Dr. Oldham)

342. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

343. The aforesaid conspiracy caused Mr. Rymer to involuntarily lose free will and become a slave to a religion not of his own choosing, thus infringing Mr. Rymer's rights under the Thirteenth Amendment to the U.S. Constitution. The psychologically reprogrammed Mr. Rymer involuntarily gave fruits of his labor in the form of tithes and offerings to numerous houses of worship. The psychologically-controlled Mr. Rymer involuntarily lost his free will and his promethean logic and reason. Such a mindset rendered Mr. Rymer unfit for an engineering career and caused mental, physical, and socioeconomic injuries to Mr. Rymer.

## COUNT THIRTY-TWO: Rescission and Restitution

344. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

345. The psychological torture and hazing that Mr. Rymer was subjected to by either of the Sterretts or Dr. Lemaster or the malicious defamation or vandalism to Mr. Rymer's *Constantineau* property rights in his reputation, his G.P.A, rendered worthless the services sold by UT Martin and purchased by Lincoln Rymer. Mr. Rymer's purchase was financed, in part, through FFELP student loans with promissory note(s) signed by Mr. Rymer to which John Doe 3 holds legal title. Pursuant to the Federal Trade Commission Trade Regulation Rule 433 Concerning the Preservation of Consumers' Claims and Defenses (The Holder Rule) promulgated at 16 C.F.R. §433 *et seq*. as authorized by the Federal Trade Commission Act, 38 Stat. 717, as amended; (15 U.S.C. 41, et seq.), Mr. Rymer seeks rescission of the promissory note(s) lawfully held by John Doe 3 and full restitution of all monies ever paid on the aforesaid note(s).

346. – 400. [Reserved.]

## VIII. PRAYER FOR RELIEF

WHEREFORE, Mr. Rymer prays for a judgment:

401. Declaring that Mr. Rymer was defrauded or injured by the defendants held liable, and in particular, that Mr. Rymer's *Constantineau* property rights in his reputation, his G.P.A., were maliciously damaged by the responsible defendants' and that Mr. Rymer's liberty, conferred in *Casey* (505 U.S. 833), was maliciously trampled by the defendants who lured, hazed, or cajoled Mr. Rymer into a religion not of his own choosing;

402. Awarding to Mr. Rymer compensatory damages for his mental suffering, disfigurement of his psyche and body, loss of enjoyment of life or hedonic damages, loss of consortium, medical expenses, loss of earning capacity, loss of business, loss of his funds invested in higher education, opportunity costs; reliance damages refunding tuition, room and board, textbooks; consequential damages for Mr. Rymer's reduced productivity, economic opportunity, and destroyed generativity; each together with prejudgment interest according to proof;

403. Awarding to Mr. Rymer punitive damages;

404. Rescission of any FFELP promissory note(s) signed by Mr. Rymer as payment for services rendered by UT Martin and restitution from the same with prejudgment interest according to proof;

405. Awarding to Mr. Rymer such other and further relief as the Court deems just and proper.

## JURY DEMAND

Mr. Rymer demands a trial by jury on all issues so triable as a matter of right and law.

Respectfully submitted,

Lincoln Rymer, pro se
154 Fowler Cemetery Lane
Hurricane Mills, TN 37078
931-296-3001
