# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **LINCOLN RYMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:16-cv-02711** |
| | ) | **Judge Roberts / Frensley** |
| **ROBERT LEMASTER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

### I.  Introduction and Background

This matter is before the Court upon a Motion to Dismiss pursuant to Fed. R. Civ. P.

12(b)(1) and (6) filed by Defendant Roger Oldham.  Docket No. 34.  Along with that Motion,

Defendant Oldham has contemporaneously filed a supporting Memorandum of Law.  Docket No.

35.  Defendant Oldham argues that Plaintiff's claims against him should be dismissed because,

"[w]hether viewed as a matter of subject matter jurisdiction or failure to state a claim, the First

Amendment and case law on the ecclesiastical abstention doctrine preclude this Court from

deciding a claim based on Dr. Oldham's exercise of his religious freedom to peacefully convert

another to his faith."  Docket No. 34.

Plaintiff has filed a Response in Opposition to the instant Motion arguing that Defendant

Oldham's Motion should be denied for reasons to be set forth below.  Docket No. 78.

Plaintiff, pro se, filed this action alleging that Defendants violated his rights under the

"Federal Computer Fraud and Abuse Act codified at 18 U.S.C. § 1030 *et seq.*; Civil Rights Act

of 1871 (commonly known as the Ku Klux Klan Act) codified at 42 U.S.C. § 1981 *et seq.*;

Racketeer Influenced and Corrupt Organizations Act (RICO) codified at 18 U.S.C. § 1961, *et seq.*; Higher Education Amendments of 1998 codified at 20 U.S.C. § 1011a; Title IX of The Education Amendments of 1972 codified at 20 U.S.C. § 1681, *et seq.*; Federal Trade Commission Trade Regulation Rule 433 promulgated at 16 C.F.R. § 433, *et seq.*; and multiple state claims which require application of federal law, viz. Family Educational Rights and Privacy Act (FERPA) and Protection of Pupil Rights Amendment (PPRA)."  Docket Nos. 1, 76, ¶ 30.[1] Plaintiff also asserts the pendent state law claims of "common law fraud, intentional infliction of emotional distress, assault, civil conspiracy, invasion of privacy, malicious harassment, breach of fiduciary duty, breach of contract, promissory estoppel, fraudulent or intentional misrepresentation, tortious interference with contractual relations, fraudulent inducement to contract, defamation, violation of the Tennessee Human Rights Act, and negligent hiring, training, or supervision of employees, negligence, negligence *per se*, strict liability, and the Tennessee Student Religious Liberty Act of 1997."  Docket No. 76, ¶ 31.

As to Defendant Oldham, Plaintiff generally argues that Defendant Oldham violated his rights by conspiring to, and succeeding in, wrongfully converting Plaintiff to Christianity through

---

[1] Without Leave of Court and after the time permitted for amending his Complaint as a matter of course had passed, Plaintiff filed his "First Amended Complaint."  Docket No. 76. Because Plaintiff is proceeding pro se and Defendants will not be prejudiced by the Court's acceptance of Plaintiff's "First Amended Complaint" as the operative Complaint, the undersigned will consider the allegations of Plaintiff's "First Amended Complaint."  Defendant Oldham's Motion to Dismiss was filed prior to the filing of Plaintiff's "First Amended Complaint" and seeks to dismiss the allegations against him in Plaintiff's original Complaint. *See* Docket No. 34.  Plaintiff's "First Amended Complaint" incorporates by reference the allegations contained in his original Complaint and adds five (5) new causes of action. *Compare* Docket No. 76 *with* Docket No. 1.  The causes of action that Plaintiff adds in his First Amended Complaint raise no new allegations against Defendant Oldham.  *See id.*  Accordingly, the undersigned will consider Defendant Oldham's Motion to Dismiss as being applicable to the allegations against him contained in Plaintiff's "First Amended Complaint."

the use of an attractive female student to lure Plaintiff into a religious conversion and by telling

him lies. *See generally*, Docket Nos. 1, 76, *passim*.[2] Specifically, Plaintiff's allegations

concerning Defendant Oldham are as follows:

> 99. Dr. Oldham, at the time of receipt of Mr. Rymer's statutorily-protected student information was **not** a member of UT Martin's faculty or staff, but rather was a private citizen who worked in Martin, Tennessee within the spiritual services industry.
>
> 100. Dr. Oldham, in his ministerial role as a spiritual adviser to Mr. Rymer, had a fiduciary duty to Mr. Rymer. Dr. Oldham, being an expert in biblical studies, would have possessed actual or constructive knowledge of the concepts behind "Flirty Fishing" stemming from the scam's prominent use in well-known Bible passages, *see* ¶ 93, *supra*.
>
> 101. Mr. Rymer told [Ms.] Lamberth, her roommate Kristin West, Dr. Oldham and others that the Rymer family despised God and that his father, Mr. Walter Rymer, will "kill him" if Mr. Walter Rymer knew that Lincoln Rymer was associating with Christians. Mr Rymer made it clear that the consequences of making a profession of faith would be "most dire". They all reassured Mr. Rymer that everything would be fine. Dr. Oldham stated that God protects believers.
>
> 102. Dr. Oldham was engaged in secret communications with a member of the staff or faculty of the UT Martin School of Engineering who engaged with Dr. Oldham in clandestine, unlawful conveyances of Mr. Rymer's student information. Mr. Rymer has multiple pieces of evidence, including an audio recording, that show Dr. Oldham was in possession of facts pertaining to Mr. Rymer's FERPA-PPRA protected student information that could only have been known by the UT Martin School of Engineering or Prof. Laura Sterrett.
>
> 103. Dr. Oldham failed to warn Mr. Rymer of a civil conspiracy against Mr. Rymer that could reasonably be expected to affect Mr. Rymer's spiritual well-being.
>
> 104. Dr. Oldham took affirmative action in furtherance of

---

[2] Although Plaintiff has sued numerous Defendants, the instant Motion has been filed by Defendant Oldham individually. *See* Docket No. 34. The undersigned will therefore discuss herein only Plaintiff's allegations and claims concerning Defendant Oldham. The remaining Defendants have filed Motions to Dismiss of their own, which the undersigned will address in a separate Report and Recommendation.

Flirty Fishing by sending Mr. Rymer an email noting how much it meant to Amanda Lamberth for Mr. Rymer to accompany her to worship services, or by failing to perform his fiduciary duty of addressing [Ms.] Lamberth's undue influence on Mr. Rymer's spiritual well-being. It would have been obvious to a reasonable person with Dr. Oldham's knowledge, an aged man wise in the ways of the world, what the source of [Ms.] Lamberth's influence was.

105. Upon information and belief, Dr. Oldham used the statutorily-protected student information, *see* ¶ 94, ¶ 102, i.a. [*sic*], *supra*, that Dr. Oldham obtained pertaining to Mr. Rymer to market religion to Mr. Rymer.

106. During the aforementioned events, Mr. Rymer assumed Dr. Oldham lived by the commandments to be pure, holy, and honest contained in the spiritual literature that was officially espoused by Dr.Oldham, and Mr. Rymer was influenced by the general cultural perception that individuals holding positions such as Dr. Oldham's are pure and honest in their motives and not evil.

107. Dr. Oldham promised that God would protect Mr. Rymer and provide for Mr. Rymer's needs if Mr. Rymer stayed faithful to God, which, in conjunction to [Ms.] Lamberth's undue influence, caused Mr. Rymer to make a religious conversion to Mr. Rymer's detriment.

108. Dr. Oldham made statements to Mr. Rymer that caused Mr. Rymer to believe that the Church would be a surrogate family to Mr. Rymer, which, in conjunction with [Ms.] Lamberth's undue influence, caused Mr. Rymer to make a religious conversion to Mr. Rymer's detriment.

109. Dr. Oldham directed Mr. Rymer to "trust God with the consequences" of making a profession of faith and Mr. Rymer did so to his most grave detriment.

110. Dr. Oldham caused Mr. Rymer to take actions that any reasonable person would know would jeopardize the socioeconomic standing and spiritual and mental well-being of a person in Mr. Rymer's circumstances by directing Mr. Rymer, who displayed no means of income or support, to tell his father about the religious conversion knowing full well that Mr. Rymer's father despised God. Within an hour after being directed by Dr. Oldham to "be sure to tell [Walter Rymer]" about the conversion, Mr. Rymer placed a phone call to his parents to tell them the "good news". At approximately 8 P.M. on December 3, 2000, the 34th wedding anniversary of his parents, Mr. Rymer made the phone call. That call set off years of family strife that nearly caused the

divorce of Mr. Rymer's parents and cause Mr. Rymer to be marginalized by many in his biological family. Mr. Rymer also lost all of his secular friends because of his conversion. Mr. Rymer's new Christian family encouraged Mr. Rymer to "hang in there" and that God would bless him and instruct him to keep the faith.

. . .

114. . . . Also during this time period, Mr. Rymer was undergoing behavior modification by [Ms.] Lamberth and Dr. Oldham and their associates. By the Spring of 2000 the behavior modification had tranquilized him.

. . .

118. On the evening of December 10, 2000 at approximately 8 P.M. defendant Dr. Oldham stated to Mr. Rymer, who was dropping out of college and leaving town, the following final parting words: "If you turn from God, God will take you on, but you'll still go to Heaven." Dr. Oldham then went on to say he'd seen it happen before . . . people who had turned from God and then died. Mr. Rymer was placed in a persistent state of fear by Dr. Oldham's statements which lasted until January 1, 2016 thereby preventing Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

119. Dr. Oldham, as a highly educated man holding a doctorate degree or experienced in the ways of the world or as a top pastor within a denomination that had been dwindling in numbers for decades without mass deaths of those so departing the faith possessed actual or constructive knowledge that God doesn't assassinate people whose faith has cooled, and that Dr. Oldham had the expectation that Mr. Rymer, a new convert, would be placed in a perpetual state of fear based upon such a dire warning.

120. Dr. Oldham, every subsequent preacher Mr. Rymer heard, and the Bible all taught that God blesses those who fear God which kept Mr. Rymer in the fear of God and prevented Mr. Rymer from discovering: his injuries, the true cause of those injuries, or the identity of a tortfeasor who caused each injury, or prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

121.  In January 2012 during a phone call, Dr. Oldham told Mr. Rymer that Christians can expect hard times, that it's perfectly normal for his generation to suffer economically given the policies of the U.S. Government.  Such statements prevented Mr. Rymer from discovering: his injuries, the true cause of those injuries, or the identity of a tortfeasor who caused each injury, or prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

122.  Mr. Rymer was, additionally, under temporally unmitigated control by agents and by a de facto agent of defendant Dr. Oldham's principals.  Such control prevented Mr. Rymer from discovering: his injuries, the true cause of those injuries, or the identity of a tortfeasor who caused each injury or prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

123.  In September 2001, while living alone in the New York City area and working as manual laborer, Mr. Rymer attempted to contact Dr. Oldham seeking spiritual guidance in the wake of September 11, 2001.  Mr. Rymer attempted to make contact via e-mail, the USPS, and telephone.  All attempts to establish contact were unsuccessful.  Mr. Rymer struggled to understand how a good God would allow 9/11.  He soon remembered Dr. Oldham's dire warning and fear came upon him that God would strike him dead for questioning God.  This intense fear gripped Mr. Rymer without waver as he feared the Jekyll and Hyde dual-nature God of the Cross, from December 10, 2000 to January 1, 2016, when he finally saw The Light and found spiritual peace in the Morning Star.  Until that time, such fear prevented Mr. Rymer from commencing legal proceedings predicated upon any fact or set of facts that a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

124.  In early 2013 Mr. Rymer discovered publicly available facts that frightened him pertaining to the affiliations of the leadership of the Southern Baptist Convention, the largest Protestant denomination in the World, and within whose top echelon Dr. Oldham is entrenched.  The 2013 discoveries caused Mr. Rymer to interpret Dr. Oldham's aforementioned dire warning of death, *see* ¶ 118, *supra*, to be a veiled death threat, thus creating

an additional dimension of fear thereby delaying Mr. Rymer until January 1, 2016 from commencing legal proceedings predicated upon any fact or set of facts a trier of fact might deem should have put the ideal reasonable person on inquiry notice or should have caused the ideal reasonable person to bring suit.

. . .

153.  On information and belief, Laura Sterrett or John Does 1 or 2 provided Dr. Oldham Mr. Rymer's information pertaining to Mr. Rymer's habits, conduct, activity, transactions, or acts from UT Martin's protected computers.  Said information included details of Mr. Rymer's internet search history including his sexual and entertainment preferences.

154.  On information and belief, Dr. Oldham used the aforementioned information to package and market the Christian religion to appeal to Mr. Rymer's specific interests.

. . .

160.  During the last week of August 2016 Mr. Rymer discovered that between the Fall semester of 1998 and 1999 Laura Sterrett set into motion a conspiracy to convert Mr. Rymer from practicing his religion to practicing her religion.  She caused the conveyance to Dr. Oldham, who worked in Martin, Tenn. in the spiritual services industry, of Mr. Rymer's statutorily-protected student information pertaining to Mr. Rymer's internet searches performed on UT computer systems ("internet search history"), sexual preferences or entertainment preferences or student activism, or, in Laura Sterrett's misguided view, Mr. Rymer's use of foul language.  Dr. Oldham then used this information to package and market the Christian religion to appeal to Mr. Rymer's specific interests. . . .

. . .

171c.  Dr. Oldham served as a PSYOPS Specialists who manipulated Mr. Rymer into a religion for purposes of achieving behavior modification in furtherance of the RICO Defendants' criminal enterprise.

. . .

195.  In connection with dealings with Mr. Rymer, Laura Sterrett or Dr. Oldham or their co-conspirators intentionally and recklessly employed devices, schemes, and artifices to defraud,

made material misrepresentations, failed to disclose material information, and engaged in acts, practices, and a course of business which operated as a fraud or deceit on Mr. Rymer, all in violation of Tennessee's common law of fraud.

196. Mr. Rymer reasonably relied on Dr. Oldham's representations and those of the "bait girl," Amanda Lamberth, and Mr. Rymer was unaware of the true facts.

. . .

213. At all times relevant and material hereto, and in furtherance of the conspiracy to retaliate against and control Mr. Rymer, Dr. Oldham, created fear of bodily harm to Mr. Rymer by:

a. Issuing a death threat to Mr. Rymer: "If you turn from God, God will take you on, but you'll still go to Heaven." Dr. Oldham then went on to say he'd seen it happen before . . . people who had turned from God and then died.

b. Dr. Oldham caused the physical separation of Mr. Rymer from his family against Mr. Rymer's free will by knowingly indoctrinating Mr. Rymer with a religion, an incendiary devise, that Dr. Oldham knew was counter to the Rymer family's tradition, causing Mr. Rymer to take refuge from the family turmoil by fleeing the Sttae of Tennessee and resettling in New Haven, Connecticut.

c. Dr. Oldham recklessly endangered Mr. Rymer by instructing Mr. Rymer to "be sure to tell your father" about the religious conversion knowing full well that Mr. Rymer's father despised God.

214. At all times relevant and material hereto, Dr. Oldham's conduct placed Mr. Rymer in reasonable fear of bodily harm.

215. At all times relevant and material hereto, Dr. Oldham knew or should have known that his conduct would place Mr. Rymer in reasonable fear of bodily harm.

216. At all times relevant and material hereto, Mr. Rymer suffered damages as a direct and proximate result of Dr. Oldham's conduct.

. . .

231. Defendants Laura Sterrett or John Doe 1 and Dr. Oldham committed the tort of intentional infliction of emotional distress when they entered into a civil conspiracy and participated in unlawful conveyance of Mr. Rymer's protected student information or devised the "Flirty Fishing" scheme with the goal of

stripping Mr. Rymer of his liberty to "define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."

232.  Dr. Oldham, knew that the Rymer family vehemently despised God and once Lincoln was duped into religion Dr. Oldham intentionally caused Mr. Rymer to verbally broadcast the announcement his new faith with specific instructions to tell the patriarch of the Rymer family and to "trust God with the consequences."

233.  Dr. Oldham, a man wise in the ways of the world, possessed constructive knowledge that Lincoln Rymer would be harmed by the intentional and reckless directive to inform the patriarch of the Rymer family of his new faith.

234.  Dr. Oldham, a man wise in the ways of the world, possessed constructive knowledge that Lincoln Rymer would be harmed by the intentional and reckless use of "Flirty Fishing."

. . .

240.  Laura Sterrett and Dr. Oldham, either acting directly together, or through a facilitating middleman, John Doe 1, acted in concert to profit by means of their unlawful or tortious conduct toward Mr. Rymer.

241.  Laura Sterrett or John Doe 1 and Dr. Oldham shared this same conspiratorial objective.

242.  Laura Sterrett or John Doe 1 and Dr. Oldham took overt acts in furtherance of the conspiracy including but not limited to the unlawful conveyance of protected student information or devising the "Flirty Fishing" scheme.

. . .

262.  From the Fall of 1999 to August 3, 2003, Dr. Oldham was either spiritual counselor or pastor to Mr. Rymer who was either counselee or parishioner to Dr. Oldham.  During such times Dr. Oldham provided advice on spiritual matters for the ostensible benefit of Mr. Rymer.  Such matters existing within the scope of the relationship establish Dr. Oldham possessing a fiduciary duty to Mr. Rymer.

263.  Despite having inside information, as evidenced by Dr. Oldham's knowledge of content from Mr. Rymer's statutorily-protected student information, Dr. Oldham failed to warn Mr. Rymer that staff or faculty within the UT Martin School of Engineering had ill will towards Mr. Rymer.  Such notice falls within the realm of necessary disclosure within the fiduciary

9

relationship because the knowledge of the existence of such ill will would cause a reasonable person in Dr. Oldham's position to fear for Mr. Rymer's emotional, mental, physical, and financial well-being thus affecting the spiritual well-being of his counselee, Mr. Rymer.

264. An additional breach of fiduciary duty arises from Dr. Oldham's role in the "Flirty Fishing" fraud. Dr. Oldham had a fiduciary duty to not act in furtherance of the "Flirty Fishing" fraud or to address the conflict of Mr. Rymer's spiritual interests in being brought to Church by a gorgeous woman. Dr. Oldham, being an expert in biblical studies, would have possessed actual or constructive knowledge of the story of Balaam's use of gorgeous women to lure Israelite men to worship Baal. Likewise, Dr. Oldham would have possessed actual or constructive knowledge of the story of the daughter of the King of Ammon luring King Solomon to worship Baal. As such, Dr. Oldham would have known the immense power Ms. Lamberth held over Mr. Rymer, and he failed to address with Mr. Rymer her undue influence on Mr. Rymer's spiritual development.

265. An additional breach of fiduciary duty arises from Dr. Oldham's failure to provide spiritual guidance to Mr. Rymer in the wake of the events of September 11, 2001 while Mr. Rymer was living alone in the NYC area, having been a Christian only for nine (9) months. Mr. Rymer wanted to know why God allowed 9/11. If Dr. Oldham had responded, though speculative, the metamorphosis of Mr. Rymer's faith may have accelerated to his present beliefs, thereby sparing Mr. Rymer more than fifteen (15) years of mental and spiritual bondage.

. . .

299. By promising that Christians are required to materially help the needy, Dr. Oldham caused Mr. Rymer to make a religious conversion and detrimentally rely upon Dr. Oldham's promises.

. . .

301. By promising that "all things work together for good to them that love God", or to "trust God with the consequences" of making a profession of faith, Dr. Oldham caused Mr. Rymer to make a religious conversion and detrimentally rely upon Dr. Oldham's promises.

302. By promising that "all things work together for good to them that love God", or to "trust God with the consequences",

Dr. Oldham caused Mr. Rymer to tell the Rymer family and his secular friends about his religious conversion and detrimentally rely upon Dr. Oldham's promises. 303. By promising to Mr. Rymer that God would kill Mr. Rymer if Mr. Rymer "turned from God", Dr. Oldham caused Mr. Rymer to remain under religious control and detrimentally rely upon Dr. Oldham's promises.

. . .

307. Dr. Oldham would reasonably expect that Mr. Rymer acting in reliance on these promises would suffer catastrophically given that Mr. Rymer had told Dr. Oldham on many occasions that the Rymer family despised God and a profession of faith would place Mr. Rymer in harm's way.

308. Mr. Rymer acted reasonably in his justifiable reliance on the promises of Dr. Oldham given the fiduciary duty Dr. Oldham had to Mr. Rymer or the culturally-engrained trust in members of the clergy.

. . .

318. Dr. Oldham represented to Mr. Rymer that God would kill Mr. Rymer if Mr. Rymer "turned from God" and that "all things work together for good to them that love God".

319. Dr. Oldham, as a co-conspirator in the Flirty Fishing conspiracy thus responsible for the acts of all those conspirators, represented that Amanda Lamberth was interested in Mr. Rymer accompanying her to numerous events for legitimate social purposes.

320. These representations were false when Dr. Oldham made them.

321. Had Mr. Rymer known that God wouldn't kill him if he "turned from God" he would have lived life differently and might have abandoned that faith after 9/11. Had Mr. Rymer known that "all things [don't] work together for good to them that love God" he would've lived life differently. Had he known that Amanda Lamberth's true intent was to covertly manipulate him into religion he would have avoided the entire scam completely and never met Dr. Oldham.

322. Dr. Oldham possessed actual or constructive knowledge that God doesn't kill people who "[turn] from God".

323. Mr. Rymer reasonably relied upon Dr. Oldham's representations because of the fiduciary duty Dr. Oldham had to Mr. Rymer or because of culturally-engrained trust in members of the clergy.

337.  Dr. Oldham sold Mr. Rymer membership into his organization based upon on [*sic*] deceptive acts in commerce. Flirty Fishing was a bait and switch sales tactic that enabled Dr. Oldham to sell his goods and services to Mr. Rymer.  Dr. Oldham sold Mr. Rymer membership into his organization based upon on [*sic*] covenants in his marketing literature, The Bible, that direct members of such global organization to materially help the needy. Goods and services were exchanged for the consideration of Mr. Rymer's liberty and weekly payments in the form of tithes and offerings.

338.  Dr. Oldham knew that Flirty Fishing is a fraudulent inducement.  Dr. Oldham possessed actual or constructive knowledge that, in general, the members of aforesaid global organization don't materially help the needy, as evidenced by the fact that aforesaid organization has existed for nearly 2,000 years and has 2.2 billion members, nearly a third (31 percent) of the earth's population, and yet poverty and hunger is rampant.

339.  Dr. Oldham advertised the false statements in order to entice Mr. Rymer, to become a member of aforesaid organization.

340.  Mr. Rymer reasonably relied on the statements because of Mr. Oldham's fiduciary duty status to him or because of culturally-engrained trust in members of the clergy.

341.  Mr. Rymer sustained aforementioned catastrophic injuries that he would not have sustained had he not entered into contract in reliance on the aforesaid statements.

*Id.,* ¶¶ 99-110, 114, 118-24, 153-54, 160, 171c, 195-96, 213-16, 231-34, 240-42, 262-65, 299, 301-03, 307-08, 318-23, 337-41.

As to damages related to his claims against Dr. Oldham, Plaintiff avers that the wrongful conversion to Christianity caused him physical, psychological, and economic damages, including stunted physical growth, premature balding, and crooked teeth.  *Id.*, ¶¶ 107-10, 125, 128-29, 157, 160, 192, 216, 225, 233, 243, 304, 307, 324, 341, 343.  Plaintiff further avers that the wrongful accessing of protected computers and use of the information contained thereon caused him to lose the financial investment in his higher education at a value exceeding $25,000, the loss of his

time invested "or opportunity costs" of pursuing his higher education at a value of approximately $100,000, hedonic damages from the loss of enjoyment of life from 1999 onward at a value of $5,000,000, the loss of his substantive rights of religious liberty at a value of $5,000,000, and the loss of his "*Constantineau* property rights in his personal reputation, assessed at a value of $5,645,000. *Id.*, ¶ 157a-e. Plaintiff additionally avers that the "secret conspiracy caused [him] to be infringed of his rights to be free from State compulsion of religion pursuant to the Establishment Clause of the First Amendment to the U.S. Constitution," as well as infringed on his "*Casey* rights." *Id.*, ¶ 160. Plaintiff seeks treble damages, along with other compensatory and punitive damages, as well as costs and fees. *Id., see also, id.*, ¶ 305.

Plaintiff further claims that as a direct and proximate result of the conspiracy to convert him to Christianity, he "became of unsound mind, lost precious time that could have been devoted to his college studies, sustained enormous socioeconomic losses, was held to public and private ridicule and contempt, and has suffered injury to his reputation, humiliation, emotional distress, and mental anguish," and he was "deprived of his *Casey* liberty to 'define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Id.*, ¶ 243. He additionally avers that, "Because of Dr. Oldham's breach of fiduciary duty, Mr. Rymer sustained aforementioned catastrophic injuries." *Id.*, ¶ 266. Plaintiff also maintains that, "Because of Dr. Oldham's misrepresentations, Mr. Rymer has suffered, and continues to suffer, economic injury and irreparable harm. He, therefore is entitled to an award of monetary damages and equitable relief. Mr. Rymer also seeks punitive damages." *Id.*, ¶ 324. Plaintiff avers, "The aforesaid conspiracy caused Mr. Rymer to involuntarily lose free will and become a slave to a religion not of his own choosing, thus infringing Mr. Rymer's rights under the Thirteenth

Amendment to the U.S. Constitution. The psychologically reprogrammed Mr. Rymer involuntarily gave fruits of his labor in the form of tithes and offerings to numerous houses of worship. The psychologically-controlled Mr. Rymer involuntarily lost his free will and his promthean logic and reason. Such a mindset rendered Mr. Rymer unfit for an engineering career and caused mental, physical, and socioeconomic injuries to Mr. Rymer." *Id.*, ¶ 343.

Defendant Oldham filed the instant Motion and supporting Memorandum of Law arguing:

> Dr. Oldham is a Baptist minister. Dr. Oldham was a Baptist minister when he spoke with Plaintiff approximately 17 years ago about the Christian faith. Plaintiff has now sued him (and others) for the Plaintiff's allegedly wrongful conversion to the Christian faith. Plaintiff does not claim any physical abuse or physical coercion in the conversion, but rather that the allegedly wrongful conversion to the Christian faith itself in which Dr. Oldham played a role caused the ruin of Plaintiff's life. Plaintiff claims that his allegedly wrongful conversion to the Christian faith itself was the alleged result from Dr. Oldham's exercise of his First Amendment rights and was the cause of Plaintiff's alleged damages. Such a claim is a matter that under the ecclesiastical abstention doctrine the Court either does not have jurisdiction to adjudicate, or alternatively, fails to state a claim upon which relief may be granted. Inquiry by a civil court in a tort context into Dr. Oldham's expressions of faith, which allegedly led Plaintiff to convert to belief in the Christian faith, would impermissibly involve this Court in church doctrine, dogma, and fundamentals of religious belief.

Docket No. 35, p. 1-2.

Defendant Oldham maintains that his only alleged role in Plaintiff's averred wrongful conversion to the Christian religion is that of a minister of faith. *Id.* at 4. Defendant Oldham notes that Plaintiff does not allege that he in any way physically abused Plaintiff or participated in subjecting Plaintiff to physical abuse, nor does Plaintiff allege that he stole property from

Plaintiff.  *Id.*  Defendant Oldham argues that although Plaintiff promulgates averments under many causes of action, the nexus from which the remainder of Plaintiff's claims against him stems is the allegedly wrongful religious conversion to Christianity.  *Id.*  Defendant Oldham reiterates his contention that any attempt to assign liability to him would turn on the exercise of his First Amendment rights to practice religion and would impermissibly involve a civil court in questions of faith.  *Id.* at 4-5.  Defendant Oldham explains:

> Plaintiff's claims against Dr. Oldham cannot be determined using neutral or secular standards.  Analysis of Plaintiff's claims against Dr. Oldham would require analysis of the truth or falsity of tenets of the Christian faith and whether one person's persuasion of another to belief in that faith (or any faith) itself can result in the damages alleged by Plaintiff.  Analysis of Plaintiff's claims against Dr. Oldham would also require into Dr. Oldham's alleged statements made to Plaintiff, the truth or falsity of those statements of faith, or to Dr. Oldham's belief in those statements of faith.  Under the ecclesiastical abstention doctrine, a court cannot inquire into such matters.  To do so would impermissibly entangle a court into the most basic questions of faith.  Such an inquiry would impermissibly involve a court in the basic right of a religion to engage in ecclesiastical discussions with members and nonmembers.  Such an inquiry would impermissibly involve a court in deciding disputes between religious groups and their disgruntled former members where the parameters of the controversy are theological, not purely secular.  There are no neutral or secular standards by which a court can test Dr. Oldham's expressions of faith to Plaintiff.  Such an inquiry would necessarily and impermissibly require a court to examine the religious practice of converting nonmembers to belief.

*Id.* at 14-15.

Plaintiff responds first that Defendant Oldham's filing of a Motion to Dismiss is "improper because he disputes that he has committed any wrongdoing," and "a Rule 12 motion [] intrinsically admits to all of the factual contentions asserted against him."  Docket No. 78, p. 1.

Plaintiff adds, "Dr. Oldham can not simultaneously admit and deny actionable wrongdoing." *Id.* at 2. Plaintiff next responds that ecclesiastical abstention "is not currently an affirmative defense and can not be raised as a ground for dismissal in a Rule 12(b)(6) motion." *Id.* Plaintiff also responds by asserting that "Dr. Oldham has made a factual attack on subject matter jurisdiction" that is "disguised as a facial attack." *Id.* at 2-3.

Plaintiff further responds: (1) "The nature of Dr. Oldham's acts and omissions preclude application of the ecclesiastical abstention doctrine in this case" because "ecclesiastical abstention applies to internal church disputes" and this action involves neither "a church nor an internal church dispute."; (2) "None of the claims can be dismissed for lack of subject matter jurisdiction on the grounds of ecclesiastical immunity because each conspirator is liable for the acts done by any of the conspirators" and "This case is about a conspiracy to academically lynch [Plaintiff] in retaliation for his free speech activities."; (3) "Dr. Oldham's subject matter jurisdiction defense is deficient under Fed. R. Civ. P. 7(b)(1)(B)" because "his mere assertion of ecclesiastical immunity does not state with particularity the grounds for his immunity from each Count as charged." *Id.* at 3-4. Plaintiff also responds, in the alternative, that Defendant Oldham is not entitled to ecclesiastical immunity even though he is a member of the clergy, because he "stepped outside of its umbrella of protections through his participation in the conspiracy and for his actions." *Id.* at 4.

Plaintiff additionally responds that Defendant Oldham cannot claim First Amendment protection because he placed Plaintiff in a state of fear by telling him that God would kill him if he ever turned from God, and "death threats, veiled or otherwise, are not protected free speech expressions." *Id.* at 6. Plaintiff continues:

Furthermore, Dr. Oldham's speech, vocal or written, were instrumentalities used in the furtherance of a heinous conspiracy to retaliate against Mr. Rymer for Mr. Rymer's campus free speech expressions. Such instrumentalities are in the category of ransom notes and sedition and are not protected speech. Dr. Oldham falsely told Mr. Rymer that the Church would be a surrogate family to him. Dr. Oldham falsely told Mr. Rymer that God would kill Mr. Rymer if he turned from God. False statements of fact are not afforded First Amendment protection.

*Id.*

Plaintiff adds:

Dr. Oldham's statement instructing Mr. Rymer to tell Walter Rymer about his new faith was reckless endangerment because Dr. Oldham knew Walter Rymer despised God. Such statement is in the category of infamous cult leader Jim Jones telling his followers to drink cyanide-laced Flavor Aid. Speech that causes other people to harm themselves is not afforded First Amendment protection.

*Id.*

As to Defendant Oldham's Fed. R. Civ. P. 12(b)(6) arguments, Plaintiff responds that:

(1) "Dr. Oldham has moved to dismiss for failure to state a claim to which relief may be granted apparently because the *Complaint* contains the prepositional phrase 'on information and belief'," but this is "vague" and "implies he seeks dismissal of all claims" such that Plaintiff is "prejudiced by having to respond to such a vague affirmative defense fails to specifically identify which claims are challenged," "fails to **show** how those claims are deficient," and fails to provide him with "'fair notice' of the nature of the defense and the grounds upon which it rests."; (2) "In the alternative, should Dr. Oldham's motion to dismiss be deemed to adequately put Mr. Rymer on notice of a pleading insufficiency predicated upon specificity, Iqbal does not require Mr. Rymer to plead facts of conspiracy with specificity."; (3) "In the alternative, the prepositional

phrase 'on information and belief' was only used in ¶ 105 and Counts I and VI and in no way, shape, or fashion causes the other claims against Dr. Oldham to be deficient under Rule 8."; (4) "In the alternative, Counts I and VI can liberally be construed or amended to overcome any deficient pleading that exists."; (5) "Moreover, Mr. Rymer has certified that the factual contentions in his Complaint have evidentiary support."; (6) "In the alternative, the prepositional phrase 'on information and belief' does not automatically render claims supported by facts so prefaced as implausible."; (7) "A court in the 6th Circuit applied case law from the 2nd Circuit that applied holding from the Supreme Court in a decision establishing pro se litigants as exempt from the heightened pleading standards of Twombly."; (8) "And finally, equitable considerations favor the denial of the motion to dismiss because a dismissal would result in grave injustice and invert the unclean hands doctrine." *Id.* at 7-14 (emphasis original).

For the reasons set forth below, the undersigned finds that under the ecclesiastical abstention doctrine, this Court does not have jurisdiction to hear Plaintiff's claims related to his averred wrongful conversion to Christianity. The undersigned also finds that the remainder of Plaintiff's claims against Dr. Oldham are conclusory; he has therefore failed to state a claim against Dr. Oldham upon which relief can be granted. Accordingly, the undersigned recommends that Dr. Oldham's Motion to Dismiss (Docket No. 34) be GRANTED, that all claims against Dr. Oldham be DISMISSED, and that Dr. Oldham be TERMINATED as a party in this action.

## II. Law and Analysis

### A. Fed. R. Civ. P. 12(b)(1)

Fed. R. Civ. P. 12(b)(1) provides that a complaint may be dismissed for lack of subject

matter jurisdiction.  A party seeking to dismiss a claim pursuant to Rule 12(b)(1) may engage in either: (1) a facial attack to the complaint; or (2) a factual attack on the allegations averred in the pleadings.  *See Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir. 1990).  A facial attack is a challenge to the court's subject matter jurisdiction that takes the material allegations of the complaint as true and construes them in the light most favorable to the nonmoving party.  *See RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1134-35 (6th Cir. 1996).  In contrast, a factual attack is "not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *United States v. Ritchie,* 15 F.3d 592, 598 (6th Cir. 1994); *see also, Ohio Nat'l Life,* 922 F.2d at 325.

## B.  Ecclesiastical Abstention Doctrine

Although not widely invoked, at its core, the ecclesiastical abstention doctrine is the theory upon which a court bases its decision that involvement in a matter that goes to the heart of a church's faith, beliefs, membership, governance, etc. would be impermissibly blurring the line between the separation of Church and State.  It is generally invoked where a court is asked to examine religious doctrine to decide a legal position or where a religious body has made a decision on religious discipline, faith, custom, rule, or law.  A court can hear a tort suit involving religion only if it turns on secular or neutral standards without reference to religious doctrine.  As the Supreme Court stated back in 1871,

> In this country the full and free right to entertain any religious belief, to practice any religious principle and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no

> dogma, the establishment of no sect. . . . The structure of
> government has, for the preservation of civil liberty, rescued the
> temporal institutions from religious interference. On the other
> hand, it has secured religious liberty from the invasion of the civil
> authority.

*Watson v. Jones*, 80 U.S. 679, 728, 730 (1871).

Soon thereafter, the Tennessee Supreme Court also spoke on the issue, holding:

> The relations of a member to his church are not contractual. No
> bond of contract, express or implied, connects him with his
> communion or determines his rights. Church relationship stands
> upon an altogether higher plane, and church-membership is not to
> be compared to that resulting from connection with mere human
> associations for profit, pleasure, or culture. The church undertakes
> to deal only with the spiritual side of man. It does not appeal to his
> purely human and temporal interests. . . Civil courts deal only with
> civil and property rights. They have in this country no
> ecclesiastical jurisdiction.

*Nance v. Busby*, 91 Tenn. 303, 324-26 (Tenn. 1982).

The Sixth Circuit aptly summarized its view of the ecclesiastical abstention doctrine in

*Ogle v. Church of God*:

> The Supreme Court has held that in matters involving "questions
> of discipline, or of faith, or ecclesiastical rule, custom, or law[,]"
> the Free Exercise Clause requires that no civil court interfere with
> the determinations of the "highest of these church judicatories to
> which the matter has been carried." The Sixth Circuit has
> unambiguously stated that "the First Amendment bars civil courts
> from reviewing decisions of religious judicatory bodies relating to
> the employment of clergy."

153 Fed.Appx. 371, 375 (6th Cir. 2005), *quoting Watson v. Jones*, 80 U.S. 679-727 (1871);

*Lewis v. Seventh Day Adventists Lake Region Conference,* 978 F.2d 940, 942 (6th Cir. 1992),

*citing Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709-10 (1995); *Presbyterian*

*Church v. Hull Church*, 393 U.S. 440, 449 (1969).

More recently, this Court addressed ecclesiastical abstention when Judge Echols found that this Court had no subject matter jurisdiction to decide the issues before him, finding that the Court's deciding the case would run afoul of the First Amendment:

> In summary, in determining whether a contract was formed or breached, whether misrepresentations were made, whether money was converted, or whether a civil conspiracy was framed, the Court would place itself in substantial danger of becoming entangled in a religious controversy about the application of the 'decrees of the House of God' central to the church's internal governance. Trial of the liability and damages issues would require the Court to make numerous credibility determinations and to find facts and draw conclusions based on those credibility determinations.

*House of God which is the Church of the Living God the Pillar and Ground of the Truth Without Controversy v. Campbell*, 2008 U.S. Dist. LEXIS 19741, *16-17 (M.D. Tenn. Mar. 13, 2008).

## C. Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Id.* A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face." *Id*. At 1965, 1974. *See also, Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

Moreover, the United States Supreme Court has recently addressed the appropriate standard that must be applied in considering a Motion to Dismiss for failure to state a claim. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 137 L. Ed. 2d 868 (2009). The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior error, but it does not unlock the doors of discovery for plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . . Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

129 S.Ct. at 1949-1950, 173 L. Ed. 2d at 884 (citations omitted).

**D. The Case at Bar**

As can be seen in Plaintiff's averments quoted above, Plaintiff's claims against Defendant Oldham turn on the veracity of his counsel and the statements of faith allegedly professed by him to Plaintiff. Analyzing Plaintiff's claims against Defendant Oldham would inherently and impermissibly involve examining faith, beliefs, religious doctrine, etc. Because the Court cannot decide Plaintiff's claims against Defendant Oldham on secular or neutral grounds without analysis of the veracity of faith, beliefs, religious doctrine, etc., the undersigned finds that, under the ecclesiastical abstention doctrine, this Court lacks subject matter jurisdiction

over these claims.

To the extent that Plaintiff alleges that Defendant Oldham is a co-conspirator with the remaining Defendants on his other claims and therefore liable as such, as can be seen in Plaintiff's averments quoted above, Plaintiff's allegations in this regard are conclusory and fail to state a claim against Defendant Oldham upon which relief can be granted.

### III.  Conclusion

For the reasons discussed above, the undersigned finds that under the ecclesiastical abstention doctrine, this Court does not have jurisdiction to hear Plaintiff's claims related to his averred wrongful conversion to Christianity.  The undersigned also finds that the remainder of Plaintiff's claims against Dr. Oldham are conclusory; he has therefore failed to state a claim against Dr. Oldham upon which relief can be granted.  Accordingly, the undersigned recommends that Dr. Oldham's Motion to Dismiss (Docket No. 34) be GRANTED, that all claims against Dr. Oldham be DISMISSED, and that Dr. Oldham be TERMINATED as a party in this action.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

JEFFERY S. FRENSLEY
United States Magistrate Judge